136 F.2d 490 (1943)
CHATLOS
v.
BROWN, Price Administrator.
No. 14.
United States Emergency Court of Appeals.
Decided May 28, 1943.
*491 Bernard M. Kommel, of New York City, for complainant.
Sol M. Linowitz, of Rochester, N. Y., Atty. (David Ginsburg, Gen. Counsel, Thomas I. Emerson, Associate Gen. Counsel, Nathaniel L. Nathanson, Asst. Gen. Counsel, and Maurice Alexandre and Betty L. Brown, Attys, Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before VINSON, Chief Judge, and MARIS and MAGRUDER, Judges.
MAGRUDER, Judge.
William F. Chatlos, owner of nearly one thousand dwelling units in the Defense-Rental Area of Bridgeport, Connecticut, brings his complaint to this court under § 204 of the Emergency Price Control Act of 1942, 56 Stat. 23, 50 U.S.C.A.Appendix, § 924, alleging that he is aggrieved by an order of the Price Administrator denying his protest against the provisions of Maximum Rent Regulation No. 5 for Housing Accommodations Other than Hotels and Rooming Houses in a Portion of the Bridgeport Defense-Rental Area, issued May 27, 1942.
Section 2(b) of the Price Control Act, 50 U.S.C.A.Appendix, § 902(b), setting forth the procedure to be followed by the Price Administrator in establishing maximum rents, is quoted in the footnote.[1] Its provisions may be summarized as follows: Before proceeding to establish maximum rents in any particular defense-rental area the Administrator must (1) form a judgment that it is necessary to stabilize or reduce rents within the particular area in order to effectuate the purposes of the Act; (2) issue a declaration setting forth the necessity for, and recommendations with reference to, such stabilization or reduction; (3) wait sixty days after the issuance of such declaration to see whether rents have been stabilized or reduced by state or local regulation, or otherwise, in accordance with his recommendations, and (4) form a judgment that rents have not been so stabilized or reduced within that period of sixty days. The Administrator may then proceed by regulation or order to establish such maximum rents as in his judgment "will be generally fair and equitable and will effectuate the purposes of this Act." The Administrator is directed "so far as practicable" to ascertain and give due consideration to the rents for housing accommodations prevailing in the particular area on or about April 1, 1941, or some other date, not earlier than April 1, 1940, on which defense activities had not, in his judgment, resulted in rental increases inconsistent with the purposes of the Act. He is directed, "so far as practicable," to make adjustments for such relevant factors as he may determine to be of *492 general applicability, "including increases or decreases in property taxes and other costs." Finally, to the extent that he deems to be practicable, the Administrator is directed to give consideration to recommendations made by state and local officials.
On March 2, 1942, the Administrator issued his Designation of the Bridgeport Defense-Rental Area and Rent Declaration Relating to That Area, 7 F.R. 1679. The declaration recited that in the described area defense activities had resulted in an increase in rentals for housing accommodations inconsistent with the purposes of the Act; that war production industries are located in the area; that due to expansion of defense activities and influx of production workers and their families, an acute shortage of rental housing accommodations has resulted; that the President has found the existence of such shortage in the Bridgeport area under the Lanham Act, 54 Stat. 1125, 42 U.S.C.A. § 1521 et seq., and the National Housing Act, 55 Stat. 56, 12 U.S.C.A. § 1738; that Bridgeport has been placed on the list of defense housing areas in which builders may secure priority ratings on critical materials for residential construction. Further, the declaration recited as follows:
"Surveys in the Bridgeport area have reported low vacancy ratios for rental housing accommodations, indicative of the abnormality of the local market. New construction in this area by private industry and by the Government has not been sufficient to restore a normal rental market for housing accommodations.
"Defense activities have resulted in substantial and widespread increases in rents, affecting most of the rental housing accommodations in the Bridgeport area. Official governmental surveys of rental change conducted in this area have shown a marked upward movement in the general level of residential rents during the past two years. By reason of these substantial increases the rents prevailing in the Bridgeport area are not generally fair and equitable."
The Administrator found that prior to April 1, 1941, defense activities had not yet resulted in increases in rents inconsistent with the purposes of the Act but did result in such increases commencing on or about that date. The Administrator's recommendations for stabilizing rents in the area were then set forth.
On May 27, 1942, the Administrator issued Maximum Rent Regulation No. 5, applicable to the Bridgeport area. 7 F.R. 4051. The regulation begins with a recital that in the judgment of the Administrator rents for housing accommodations in the designated area "have not been reduced and stabilized by State or local regulation, or otherwise, in accordance with the recommendations set forth in said Designation and Rent Declaration." Further, it is recited: "The Administrator has ascertained and given due consideration to the rents prevailing for housing accommodations within the said portion of the Bridgeport Defense-Rental Area on or about April 1, 1941. It is his judgment that defense activities had not resulted in increases in rents for such housing accommodations inconsistent with the purposes of the Emergency Price Control Act of 1942 prior to April 1, 1941, but did result in such increases commencing on or about that date. The Administrator has made adjustments for such relevant factors as he has determined and deemed to be of general applicability in respect of such housing accommodations, including increases or decreases in property taxes and other costs." The substantive provisions of the regulation put into effect the recommendations contained in the aforementioned rent declaration.
The regulation establishes the maximum rents which may be demanded or received for use or occupancy on and after June 1, 1942, of housing accommodations within the designated area. For housing accommodations rented on April 1, 1941, the rental prevailing on that date is fixed as the maximum rent. Other provisions fixed the maximum rent for housing accommodations which were not rented on April 1, 1941, and for new construction. Section 5 of the regulation provides seven grounds on which a landlord may file a petition for adjustment to increase the maximum rent otherwise allowable. Petition for adjustment on any other ground is precluded. The allowable grounds, in general, cover situations in which the rent on the maximum rent date was not fixed by normal economic forces in a free competitive market, or where there has been a major capital improvement or a substantial increase in the services furnished by the landlord. No provision is made for adjustment on account of increased operating costs since the maximum rent date.
*493 Complainant filed his protest on July 15, 1942, asserting that the regulation is not in accordance with law and arbitrary and capricious, chiefly on the grounds (1) that "it fails to make any provision for relief for landlords by reason of increases in operating costs occurring subsequent to April 1, 1941," and (2) that "it stabilizes rents at the lower levels prevailing on April 1, 1941, whereas prices of building supplies and services necessary for the proper and required operation of the buildings have been stabilized at the generally higher levels prevailing in March, 1942." The protest recited that despite rising costs protestant had not raised his rentals until on and after September 1, 1941; that on May 1, 1942, his rentals had been raised approximately $1.85 per unit per month, an increase of less than 5% on the average over the rentals in effect on the maximum rent date, April 1, 1941; that these increases were extremely moderate and reasonable under the circumstances. The protest concluded with a prayer that Maximum Rent Regulation No. 5 be amended to permit application to be made to the local regional office of the Administrator for adjustment of the maximum rent upon the ground of substantially increased operating costs occurring since April 1, 1941, and that the protestant be permitted to continue in effect his rentals prevailing on May 1, 1942, as set forth in an attached schedule.
On August 25, 1942, the Administrator, pursuant to § 203(b) of the Act, incorporated in the record certain economic data and other facts of which he took official notice. Thus included were various tables of income and expense of Chatlos on account of his operations as a whole and broken down into averages per dwelling unit for the years 1939 through the first half of 1942, the retail prices and indices of coal in Bridgeport for 1937-1942, and a statement concerning increases in electric energy rates in Bridgeport. Also included were certain economic conclusions, one of which  quoted by us later in this opinion  dealt with the effect of high occupancy and war conditions upon actual expenditures in the operation of rental housing. The order incorporating these materials afforded protestant an opportunity to furnish in affidavit form "such relevant evidence as he may desire in rebuttal of the aforementioned materials, together with such other relevant evidence as the protestant may desire to present." Chatlos submitted a rebuttal affidavit analyzing from his point of view some of the tables setting forth his income and expense, and attaching an exhibit showing prices paid for bituminous coal and a letter from the power company confirming an increase in electric energy rates.
The Administrator on December 10, 1942, entered an order, with accompanying opinion, denying the protest. Thereafter on January 8, 1943, Chatlos filed his complaint in this court.
Complainant does not challenge the constitutionality of § 2(b) of the Price Control Act authorizing the Administrator to prescribe maximum rents for housing accommodations in defense-rental areas; nor does he deny that the situation in the Bridgeport area called for the exercise by the Administrator of his statutory power.
Furthermore, complainant properly concedes that the Act "specifically authorized the Maximum Rent Date Method" of rent stabilization adopted by the Administrator in Maximum Rent Regulation No. 5. Rentals are thus rolled back and frozen as of an earlier date and at levels which landlords and tenants had worked out for themselves by free bargaining in a competitive market, prior to the time when defense activities had injected into the market an abnormal factor resulting, or threatening to result, in rent increases inconsistent with the purposes of the Act. This method has been used in England. See 5 and 6 Geo. V, c. 97; 10 and 11 Geo. V, c. 17; 2 and 3 Geo. VI, c. 71. The same is true in Canada. See Orders-in-Council, P.C. 4616, Sept. 11, 1940; P.C. 5003, Sept. 24, 1940; P.C. 8965, Nov. 21, 1941. Shortly before the passage of the Emergency Price Control Act of 1942, Congress prescribed the maximum rent date method in the District of Columbia Emergency Rent Act, 55 Stat. 788, D.C. Code 1940, § 45  1601 et seq. On the face of § 2(b) of the Price Control Act it is evident that Congress contemplated this method as a permissible one for the Administrator to adopt, though its use was not made mandatory, § 2(c) providing that regulations "may be established in such form and manner * * * as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of this Act." The committee reports emphasize that § 2(c) "provides for flexibility in the establishment of maximum price and rent, and other, regulations under *494 the bill." House Rep. No. 1409, 77th Cong., 1st Sess., p. 6; Sen. Rep. No. 931, 77th Cong., 2d Sess., p. 17. Further, the Senate report just referred to specifically states: "Maximum prices or rents for all commodities may of course be established in terms of prices prevailing generally or in individual establishments on a particular date, and permissible variations therefrom."
Complainant does, however, assert that the Administrator acted arbitrarily in selecting April 1, 1941, as the maximum rent date. This happens to be the very date suggested by Congress itself in § 2(b) of the Act as one on which rentals then prevailing would probably not reflect increases due to the impact of defense activities. Neither in his protest nor in his complaint does Chatlos challenge the correctness of the Administrator's determination that the most recent date which does not reflect increases in rents in the Bridgeport area inconsistent with the purposes of the Act is on or about April 1, 1941. Upon the basis of this finding, which we must accept as correct, the Administrator was justified in fixing April 1, 1941, as the maximum rent date.
Complainant's real and substantial objection, therefore, is not so much to the Administrator's selection of April 1, 1941, as the basic date as it is to his failure to make provision for adjustments on account of increases in operating costs occurring after such date. The Administrator is directed in § 2(b) of the Act to make adjustments, so far as practicable, for such relevant factors as he may determine to be of general applicability, including increases or decreases in property taxes and other costs. In fact the regulation contains no provision for adjustment on account of cost increases since the maximum rent date. As above indicated, the regulation contains the recital that the Administrator "has made adjustments for such relevant factors as he has determined and deemed to be of general applicability in respect of such housing accommodations, including increases or decreases in property taxes and other costs." At the argument before us counsel for the Administrator explained that what the Administrator meant was that he had given consideration to the factor of cost increases since the maximum rent date and had determined that this factor did not call for the making of any adjustments. If this is what the Administrator meant he expressed the thought in a curious way. However, the point is not important. We must look to the record before us to see whether complainant has established that failure of the Administrator to make provision for adjustment upwards on account of increased costs rendered the maximum rents established in the regulation generally unfair and inequitable. If not, then the regulation is not rendered invalid by the failure of the Administrator to recite that he had considered the factor of increased costs and had come to the conclusion that because of other compensating factors the freezing of the rentals as of April 1, 1941, was generally fair and equitable without any adjustment on account of cost increases since that date. In § 2(b) of the Act, dealing with rent regulations, the Administrator is not required to publish a statement of considerations involved in the issuance of such regulations, as he is required to do in § 2(a) dealing with maximum price regulations.
It is conceded that some elements of landlords' costs in the Bridgeport area have increased since the maximum rent date, April 1, 1941. But in determining whether the maximum rents established in the regulation are generally fair and equitable, consideration must be given to the over-all operations of the landlords' properties as business units. See Sen. Rep. No. 931, 77th Cong., 2d Sess., pp. 15-16. Increased costs in some particulars may be offset, in whole or in part, by savings elsewhere. As the Administrator puts it, in one of his economic conclusions incorporated in the record: "As a natural result of war conditions, governmental restrictions, material and labor shortages, and the trend to conserve on manpower and critical materials to assist the war production program, and to the extent that high occupancy and other war conditions have eliminated competitive replacement of materials long before the expiration of their useful life, there has been a consistent trend towards more efficient operation of rental housing and towards the conservation of much material and labor formerly consumed in such operation."
Increased occupancy, due to housing shortages enhanced by war activities, also has the effect of increasing the gross income of the landlords affected and thus has a bearing on the over-all operations of the landlords under rent control. Congressman *495 Steagall, chairman of the House committee which reported out the bill, said to the House, in explaining its terms: "The Administrator may also consider other relevant factors of general applicability, one of which might properly be changes in the amount and rate of vacancies during the period since April 1, 1940."[2] 87 Cong.Rec. 9072. Complainant objects that it is unfair to use the increased gross income from this source as an offset against increased costs of operation. This, he argues, should be offset against the much lower occupancy rate which prevailed in earlier years and will likely prevail again after the present emergency is over. But complainant is not entitled to "make a killing" in war time in order to compensate for losses in earlier years and anticipated losses in the future. If complainant's proposition were accepted, it would be equally applicable to persons subjected to price control in the sale of goods and services and would obviously jeopardize the entire stabilization program.
The transcript of the proceedings before the Administrator includes information as to comparative costs, occupancy rates, and income, for complainant's Bridgeport properties. Because of the large number and variety of complainant's dwelling units his properties were accepted by the Administrator as constituting a representative sample of rental operations in the area generally. Most significant of the tables included is one showing the average monthly gross income, expenses and net income per dwelling unit. The computations are for the years 1939, 1940 and 1941. Computations are also made for the first six months of 1941, this being a period which includes the maximum rent date, and for the first six months of 1942, during which period complainant had the advantage of increased rentals over those which were in effect on April 1, 1941, the regulation not having gone into effect until June 1, 1942. There are also estimated figures for the last six months of 1942, during which period rent control was in operation.
Comparing the operations for the first six months of 1941 with the estimated figures for operations for the last six months of 1942 under rent control, total expenses (including fuel) increased from $16.63 per month per dwelling unit to $17.62 in the latter period, or a net increase in operating costs of 99¢ per month per dwelling unit. The occupancy rate for the first six months of 1941 was 98.1%, for the first six months of 1942, 99.6%, and it is assumed in the estimates for the last six months of 1942, under rent control, that the occupancy rate would be at least as high as during the first half of that year. On this basis it appears that the vacancy loss under rent control is 16¢ per dwelling unit per month as compared with a vacancy loss of 73¢ per dwelling unit per month during the first half of 1941. The difference of 57¢ represents an actual increase of rental income per dwelling unit per month under rent control. When this increase of income is offset against the net increase of expenses, the net operating income under rent control, before payment of fixed charges, is estimated as being 42¢ per dwelling unit per month less than during the first half of 1941. Complainant's net income after deduction of fixed charges for interest and depreciation is estimated to be 56¢ per dwelling unit per month less under rent control than during the first six months of 1941. For the second half of 1942, under rent control, complainant's net income from the properties is estimated to be 7% lower than during the first six months of 1941, or approximately $36,000 as against $39,000.
There might be some doubt as to the representative character of complainant's expenses in the first half of 1941, due to the shortness of the period taken. Average operating expenses per dwelling unit per month from January, 1939, through June 30, 1941, two and a half years, were $16.94, as against $16.63 for the first six months of 1941 or 31¢ higher. Taking this as a more normal expense figure, the net increase of expenses under the first six months of rent control, as estimated, would be only 68¢ per dwelling unit per month over the expenses in a representative period of two and a half years prior to the time when increased defense activities began to produce an abnormal situation. Offsetting this increase of 68¢ is the 57¢ greater income due to increased occupancy occurring after the maximum rent date, which leaves a quite negligible difference of 11¢ per dwelling unit per month.
By computation from the included tables it appears that complainant's estimated annual net income from the properties under *496 rent control is much larger than his net income for 1939 and substantially larger than his net income for 1940. The record is bare of any showing that complainant and other landlords in the area are not earning under rent control a fair return on their investments.
Complainant contends that the Administrator failed to take due account of the asserted fact that recent economies in operation do not represent real savings and should not be used to offset increases in certain items of expense, such as fuel, labor and war risk insurance, because such economies for the most part are due to the deferring of certain items of maintenance, postponement of which will ultimately impose a cumulative burden upon him. It appears that the amount expended in 1942 for maintenance was $10,000 less than in 1940, in spite of the fact that 1942 costs were higher. He argues that money not spent by failure properly to maintain the buildings is not saved "because it must be spent at some future time and the cost of such maintenance will be augmented in geometric proportion as the time of neglect is extended." We think this argument is sufficiently answered in the Administrator's opinion accompanying the denial of the protest. The Administrator points out that, according to the operating statements in the transcript, continued and substantial expenditures for maintenance are being made at the present time. Complainant failed to present any evidence breaking down the figures for maintenance expenses so as to indicate that any items of maintenance have been deferred which would result in a subsequent cumulative burden. The Administrator makes the generalization that operating economies effected by landlords in these times result for the most part from reduction of competitive expenditures, deferment of which in no way imposes a cumulative burden on rental property. If such was not the case here, the burden was on complainant to establish the contrary.
Upon the whole case we conclude that complainant has not maintained the burden put upon him by § 204(b) of establishing to our satisfaction that the regulation is not in accordance with law, or arbitrary or capricious.
We recognize the possibility that maximum rents generally fair and equitable under the circumstances existing when the regulation was promulgated may subsequently become unfair and inequitable because of great increases of net operating costs affecting landlords generally. Such changed conditions would afford to landlords fresh ground for protest under § 203(a) and review in this court under § 204(a). In addition to this statutory remedy, § 12 of the regulation under review provides that persons seeking any amendment of the regulation, of general applicability, may file petitions therefor in accordance with the Administrator's Procedural Regulation No. 3.
The complaint is dismissed.
NOTES
[1] "(b) Whenever in the judgment of the Administrator such action is necessary or proper in order to effectuate the purposes of this Act, he shall issue a declaration setting forth the necessity for, and recommendations with reference to, the stabilization or reduction of rents for any defense-area housing accommodations within a particular defense-rental area. If within sixty days after the issuance of any such recommendations rents for any such accommodations within such defense-rental area have not in the judgment of the Administrator been stabilized or reduced by State or local regulation, or otherwise, in accordance with the recommendations, the Administrator may by regulation or order establish such maximum rent or maximum rents for such accommodations as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act. So far as practicable, in establishing any maximum rent for any defense-area housing accommodations, the Administrator shall ascertain and give due consideration to the rents prevailing for such accommodations, or comparable accommodations, on or about April 1, 1941 (or if, prior or subsequent to April 1, 1941, defense activities shall have resulted or threatened to result in increases in rents for housing accommodations in such area inconsistent with the purposes of this Act, then on or about a date (not earlier than April 1, 1940), which in the judgment of the Administrator, does not reflect such increases), and he shall make adjustments for such relevant factors as he may determine and deem to be of general applicability in respect of such accommodations, including increases or decreases in property taxes and other costs. In designating defense-rental areas, in prescribing regulations and orders establishing maximum rents for such accommodations, and in selecting persons to administer such regulations and orders, the Administrator shall, to such extent as he determines to be practicable, consider any recommendations which may be made by State and local officials concerned with housing or rental conditions in any defense-rental area."
[2] The suggested stabilization date in § 2 (b) of the bill as it then read was April 1, 1940. This was subsequently changed to April 1, 1941.