137 F.2d 654 (1943)
TAYLOR
v.
BROWN, Price Adm'r.
No. 10.
United States Emergency Court of Appeals.
Submitted May 10, 1943.
Decided July 15, 1943.
Rehearing Denied July 30, 1943.
Writ of Certiorari Denied November 15, 1943.
*655 *656 Stanley W. Taylor, in propria persona, and C. M. Walter, of Oakland, Cal., and John C. Stirrat, of San Francisco, Cal., for complainant.
David Ginsburg, Gen. Counsel, Thomas I. Emerson, Associate Gen. Counsel, Nathaniel L. Nathanson, Asst. Gen. Counsel, and Sol M. Linowitz, Carl H. Fulda, Maurice Alexandre, and Betty L. Brown, Attys., all of the Office of Price Administration, all of Washington, D. C., for respondent.
Before VINSON, Chief Judge, and MARIS and MAGRUDER, Judges.
Writ of Certiorari Denied November 15, 1943. See 64 S.Ct. 194.
MARIS, Judge.
The complainant is the owner of certain real property in San Francisco, California, consisting of 53 rental units. His property is situated in the San Francisco Bay Defense-Rental Area with respect to which the Price Administrator established maximum rents, effective July 1, 1942, by Maximum Rent Regulation No. 28 issued June 30, 1942.[1] The regulation froze rents in the area at the level of March 1, 1942. Without showing that he had been adversely affected by the regulation the complainant filed a protest against it with the Administrator setting up as grounds of protest the unconstitutionality of the regulation and of the Emergency Price Control Act of 1942[2] under which it was issued. The Administrator denied the protest upon the ground that he was compelled to accept the constitutionality of the act. Thereupon the complainant filed his complaint in this court and in it, again without averring that he had been adversely affected, attacked the regulation and the act upon a broad constitutional front. We are *657 thus called upon to consider the constitutional validity of the act and regulation generally and without regard to their particular application to the complainant.
We entirely agree with the three-judge district court in Henderson v. Kimmel, D. C.Kan.1942, 47 F.Supp. 635, that it is no longer open to doubt that rent control is necessary to the effective prosecution of the war effort. As Circuit Judge Phillips well said in that case (page 642 of 47 F. Supp.): "It is necessary in order to prevent the disastrous effects of inflation, to protect the families of men in the armed service, to attract workers to vital defense areas, to bring about a fair distribution of essential labor among the several defense areas, and to insure defense workers of housing accommodations at rentals that are not exorbitant. In short, it is necessary to maintain civilian morale and insure the production of necessary armaments."
The experience of this and other countries has shown that inflation is one of the greatest dangers to the home front in time of war. As the Administrator has pointed out in his brief, rent control is of first importance in preventing inflation. In the average family budget rent is, after food, the largest single item. From 15% to 30% of the wage earner's income is ordinarily devoted to payment of rent. Studies indicate that wage earners with moderate incomes in large American cities usually spend 20% of their earnings for rent.[3] In urban communities, three out of five families in 1940 were tenants and approximately $5,000,000,000 in rent was paid for nonfarm tenant-occupied dwelling units.[4]
Increases in rents have an immediate effect on wage earners. Other items are normally bought in small quantities and a small increase in the price of such commodities makes no great impression upon the wage earner. Rents are paid in lump sums, however, and wage earners are acutely aware of the fact that their living costs are increasing when rents are raised. Furthermore, in the case of most commodities, wage earners can reduce their purchases and thereby adjust their budgets to price increases; in the case of rental housing in war centers, however, workers generally have no choice, because the supply of housing is so severely limited. Accordingly, wage earners tend to demand wage increases to offset encroachments on their living standards resulting from higher rents. If such wage increases are not granted, labor friction and strikes may arise to impede the prosecution of the war. If wages are raised, the pressure for increased prices soon makes itself felt. Further demands for wage increases are thereby engendered. Thus an inflationary spiral initiated by rent increases gathers momentum. The vital importance of the rent control program to the war effort is thus apparent.[5]
We, therefore, pass to the question whether the act and the regulation are within the war power of Congress. That power is conferred by the following provisions of Art. 1, Sec. 8, of the Constitution:
"The Congress shall have Power To lay and collect Taxes, * * * to pay the Debts and provide for the common Defence and general Welfare of the United States; * * *
"To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;
"To raise and support Armies * * *;
"To provide and maintain a Navy;
"To make Rules for the Government and Regulation of the land and naval Forces;
"To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; * * *
"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, * * *."
The power thus granted is of the widest scope. Its breadth was well described by Justice Sutherland in United States v. Macintosh, 1931, 283 U.S. 605, 622, 51 S.Ct. 570, 574, 75 L.Ed. 1302, as follows: "From its very nature the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams, `This power *658 is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property and of life.' To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; prices of food and other necessities of life fixed or regulated; railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war." As was said by Chief Justice Hughes in Home Bldg. & L. Ass'n v. Blaisdell, 1934, 290 U.S. 398, 426, 54 S.Ct. 231, 235, 78 L.Ed. 413, 88 A.L.R. 1481: "It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme co-operative effort to preserve the nation." See also the Legal Tender Cases, 1870, 79 U.S. 457, 12 Wall. 457, 20 L.Ed. 287; Hirabayashi v. United States, June 21, 1943, 63 S.Ct. 1375, 87 L.Ed. ___.
We accordingly conclude that the power to fix maximum rents for housing accommodations is within the war power conferred upon Congress by the Constitution.
The complainant contends that the rent control provisions of the Emergency Price Control Act violate the Constitution in that they involve an improper delegation of legislative authority by Congress to the Administrator. We find no merit in this contention. Section 1(a) of the act[6] declares it to be necessary to the effective prosecution of the present war and to be the purpose of the act
"to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices in the manner provided in section 3; and to permit voluntary cooperation between the Government and producers, processors, and others to accomplish the aforesaid purposes."
Here is a full and detailed statement of the Congressional purpose. It is followed in Section 2(b)[7] by the specification of standards to which the rent regulations of the Administrator are to conform. The regulations may be applied only to housing accommodations in defense-rental areas in which defense activities shall have resulted or threatened to result in increases in rents for housing accommodations inconsistent with the purposes of the act. The maximum rents established by the regulations are to be generally fair and equitable and such as will effectuate the purposes of the act. The Administrator is authorized to fix maximum rents at the level of April 1, 1941, unless he finds that some other date (not earlier than April 1, 1940) is more appropriate to eliminate increases in rents due to defense activities. Finally the Administrator is required to make adjustments for such relevant factors as he may find to be of general applicability in respect of such housing accommodations, including increases and decreases in property taxes and other costs.
We have no doubt as to the constitutional sufficiency of these standards for the guidance of the Administrator in the light of the act's recital of the Congressional purpose. It is obvious that in a desperate emergency of war such as at present confronts the country Congress could not itself appraise all the factors necessary to be considered in fixing maximum *659 rentals in each of the hundreds of diverse defense-rental areas which would be generally fair and reasonable in their local setting and which would carry out the Congressional purpose. In carefully stating its purpose and the standards which the Administrator is to follow in effectuating that purpose in the areas involved, Congress has done all that the Constitution requires of it. It is well within its power to clothe the Administrator with authority to ascertain the rental areas in which maximum rent regulation is required and to formulate in accordance with the standards set by the act the details of such regulations in each such area. United States v. Rock Royal Co-op., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Sunshine Coal Co. v. Adkins, 1940, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; Opp Cotton Mills v. Administrator, 1941, 312 U.S. 126, 657, 61 S. Ct. 524, 85 L.Ed. 624; Commonwealth & South. Corp. v. Securities and Exch. Commission, 3 Cir., 1943, 134 F.2d 747.
Nor is the delegation of power to the Administrator rendered invalid by the provisions of Section 2(c)[8] of the act which authorize him in his regulations and orders to make classifications and differentiations and to provide for adjustments and reasonable exceptions, since these are to be only such as are necessary or proper in order to effectuate the purposes of the act. The objectives of the act are so clearly stated in Section 1(a) that this requirement is a sufficient measure of the authority delegated by Section 2(c). Pittsburgh Plate Glass Co. v. National Labor Relations Board, 1941, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251. We conclude that the act does not involve an unconstitutional delegation of legislative power to the Administrator.
The complainant next urges that the rent control provisions of the act and regulation are unconstitutional in that they impair the obligation of contracts, i. e., the existing leases, in that they are discriminatory against the housing industry, and in that they are confiscatory as applied to that industry. These contentions are all bottomed upon an alleged violation of the Fifth Amendment. Although the complainant has failed to show that he has been injured and, therefore, strictly speaking, has not established a right to raise these objections, we will nevertheless consider them on their merits.
It may be conceded that the act and regulation have the effect of impairing the obligation of certain existing leases. But even the States, to which the contract clause of the Constitution specifically applies, are not prohibited from impairing existing contracts when incidental to the proper exercise of their sovereign power to protect the safety, health and welfare of their people. Marcus Brown Co. v. Feldman, 1921, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877; Home Bldg. & L. Ass'n v. Blaisdell, 1934, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481. Likewise Acts of Congress the effect of which has been to impair existing contracts, have been many times sustained.[9] As we have seen, the act here in question is an exercise of the war power of the federal government. Private contracts cannot stand in the way of the exercise of this power. As Justice Holmes said in Dillingham v. McLaughlin, 1924, 264 U.S. 370, 374, 44 S.Ct. 362, 364, 68 L.Ed. 742: "The operation of reasonable laws for the protection of the public cannot be headed off by making contracts reaching into the future." We do not have here a situation in which private property has been taken for public use without just compensation within the meaning of the Fifth Amendment, as the complainant charges. It is argued that the act and regulations unconstitutionally discriminate against the owners of housing accommodations. In this connection it is to be remembered that uniformity in the application of regulatory statutes is not required by the Constitution, Currin v. Wallace, 1939, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Detroit Bank v. United States, 1943, 317 U.S. 329, 63 S.Ct. 297, 87 L.Ed. ___, and that *660 statutory classifications based upon differences in the economic situation of the classes affected or upon the legislative desire to encourage particular industries or economic groups is not invalid. Steward Machine Co. v. Davis, 1937, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293; Tigner v. Texas, 1940, 310 U.S. 141, 60 S. Ct. 879, 84 L.Ed. 1124.
The complaint is that the act and regulation discriminate against the housing industry because the act exempts wages, prices in a number of specified industries, and rents of nonresidential real estate and because the regulation exempts from control rents of certain employees and agricultural workers. We find nothing invalid in this classification, however. It is clear that Congress found that a greater need existed for the regulation of residential rents than of those of nonresidential properties or of wages or the charges of the exempted industries. There is a strong presumption that Congress correctly understood the needs of the nation and that the discriminations which it placed in the act were based upon adequate grounds. Middleton v. Texas Power & Light Co., 1919, 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527. We have already adverted to some of the reasons which support the Congressional conclusion.
Then it is said that the rent control provisions of the act are confiscatory and thereby run afoul of the due process clause of the Fifth Amendment. In Wilson v. Brown, Em.App., 137 F.2d 348, decided today, we have fully discussed this contention and held it to be untenable. We need add nothing here to what is there said on this subject. We conclude that the act and regulation do not violate the Fifth Amendment.
The complainant urges that the act and regulation violate the constitutional provisions regarding unreasonable searches and seizures, ex post facto legislation and the right to trial by jury. His contentions as to unreasonable searches and seizures and ex post facto legislation are wholly without merit and require no discussion. His contention with respect to the right of trial by jury is answered against him by the decision of the Supreme Court in Block v. Hirsh, 1921, 256 U.S. 135, 158, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165.
The complainant argues that the act and Procedural Regulation No. 3[10] issued by the Administrator thereunder deprive him of a fair hearing. The provisions of Section 204[11] of the act conferring exclusive jurisdiction upon this court to set aside price and rent regulations and denying to all other courts, federal, state or territorial, the power to consider the validity of such regulations or to restrain the enforcement thereof, are said unconstitutionally to deny him recourse to local courts. The provisions of the act which prohibit this court from issuing temporary restraining orders and interlocutory decrees and which postpone the effectiveness of the decrees of this court for a period of thirty days and when certiorari is asked for until action by the Supreme Court, are said to render the act invalid. The provisions of the act and of the procedural regulation are said to subject the complainant to the arbitrary authority of the Administrator without proper opportunity for protest and hearing.
It is settled that Congress has complete power to determine the jurisdiction of the inferior federal courts and to grant, withhold, restrict or withdraw jurisdiction in its discretion. Kline v. Burke Constr. Co., 1922, 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077. It is equally clear that Congress may vest exclusive jurisdiction in federal courts over causes arising under a federal statute. The Moses Taylor, 1866, 71 U.S. 411, 4 Wall. 411, 18 L.Ed. 397. The act vests in this court jurisdiction to consider the validity of price and rent regulations and by its terms seeks to make that jurisdiction exclusive.[12] We are not called upon to decide, however, whether the provisions of the act which thus deny similar jurisdiction to all other courts are constitutionally effective to do so, since even if they should be held invalid the remaining provisions of the act would not, in the light of the separability clause of Section 303, 50 U.S.C.A.Appendix § 943, be affected thereby.
We do not think that the denial to this court of power to grant interlocutory *661 relief renders the act invalid. The due process clause does not guarantee to litigants the right to any particular form of relief. Gibbes v. Zimmerman, 1933, 290 U. S. 326, 54 S.Ct. 140, 78 L.Ed. 342. Interlocutory injunctive relief is normally granted only as a matter of discretion and it has been denied in cases involving governmental action when the probable harm to the public interests if a restraining order is granted outweighs the probable injury to the complainant if it is denied. See Tennessee Valley Authority v. Tennessee Electric Power Co., 6 Cir., 1937, 90 F.2d 885. There is no constitutional reason why Congress may not itself determine that in appropriate circumstances interlocutory injunctions or their equivalent shall not be granted by the courts to stay governmental action pending determination of its validity. In fact Congress has many times done just this and has been upheld in doing it.[13] What Justice Frankfurter said in Scripps-Howard Radio, Inc. v. Federal Communications Commission, 1942, 316 U.S. 4, 62 S. Ct. 875, 86 L.Ed. 1229, is especially significant in this connection:
"`A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant. In re Haberman Manufacturing Co., 147 U.S. 525, 13 S.Ct. 527, 37 L.Ed. 266. It is an exercise of judicial discretion. The propriety of its issue is dependent upon the circumstances of the particular case.' Virginia Ry. v. United States, 272 U.S. 658, 672, 673, 47 S.Ct. 222, 227, 228, 71 L.Ed. 463." [pages 10, 11 of 316 U.S., page 880 of 62 S.Ct., 86 L.Ed. 1229].
"The numerous laws in which Congress has established administrative agencies for the exercise of its regulatory powers do not disclose any general legislative policy regarding the power to stay administrative orders pending review. Some statutes are wholly silent; some turn a court review into an automatic stay; some provide that the commencement of a suit shall not operate as a stay unless the court specifically so provides; some authorize the reviewing court to grant a stay where necessary. Significantly, the recent Emergency Price Control Act of 1942 [56 Stat. 23], explicitly denies the power of the reviewing court to enjoin enforcement of the administrative orders. * * *
"The various enactments in which the staying power is made explicit, as well as the statutes that are silent about it, afford debating points but no reliable aids in construing the Act before us. One thing is clear. Where Congress wished to deprive the courts of this historic power, it knew how to use apt words  only once has it done so and in a statute born of the exigencies of war." [pages 16, 17 of 316 U.S., page 883 of 62 S.Ct., 86 L.Ed. 1229.]
It must be borne in mind that the Emergency Price Control Act dealt with an emergency in which immediate action by the Administrator was of first importance and preliminary restraint might well prove disastrous. Judge Phillips stated the necessity for these provisions very cogently in the Kimmel case, 47 F.Supp. 635, page 644, when he said: "The exclusive jurisdiction and the prohibition against a stay are indispensable to the successful operation of wartime rent control. They are designed for the protection of the public interest through the maintenance of uninterrupted control in all areas subject to maximum rent regulations pending the completion of orderly review proceedings. Were the validity of the regulation subject to review and stay by statutory three-judge courts in the several judicial districts throughout the United States, control might be interrupted and rents allowed to soar at any time in any defense-rental area. Release of control in one area while it remains in effect in another would be disastrous to the program. It would destroy its essential equilibrium. It would result in pressure on workmen to move out of uncontrolled defense areas in order to obtain shelter in areas where rents are lower or still under control. There would be a corresponding inability to secure labor for necessary war productions where control was stayed or interrupted. Release of the forces of inflation in one or more areas would have an inflationary effect throughout the nation. Hence, control of rent inflation *662 in wartime cannot accomplish its purpose unless it is effective throughout the nation from the very outset and continues to be effective while normal administrative remedies are being applied and judicial consideration of the program is being completed. It must not be permitted to get out of hand in a particular area or areas. No bond or deposit could safeguard the incalculable values, both public and private, which are at stake when inflationary controls are challenged in wartime. No price can be placed upon military needs and national morale. Hence, the Congress wisely recognized that the national safety demands continuity of price and rent control until, in pursuance of an orderly course of proceedings, a decision of the highest court of the land has been had upon the supremely important questions of fact and law involved, and appropriately provided for an exclusive jurisdiction, and that there should be no stay of the Act, of a regulation, or order pending review."
We find no merit in complainant's contention that Section 203 of the act and Procedural Regulation No. 3 did not afford him a fair opportunity for protest and hearing upon the rent regulation to which he objects. Section 203[14] authorizes the filing of a protest by any person subject to a regulation or order of the Administrator. The protestant may support his protest with affidavits and other written evidence. The Administrator must act promptly upon the protest, either granting or denying it, noticing it for hearing or giving the protestant an opportunity to present further evidence. If his protest is denied Section 204 authorizes the protestant to bring his case to this court which is fully empowered to set aside a protested regulation or order if it is shown to be arbitrary, capricious or not in accordance with law. This court may authorize the introduction of additional evidence upon application of either party.
Procedural Regulation No. 3 not only follows the statute in providing for the consideration of protests, establishing simple and inexpensive requirements therefor,[15] but also authorizes the filing of petitions for adjustments[16] and for amendment of regulations.[17] We think that this procedure is adequate to protect the rights of the complainant and, therefore, accords him due process of law. As the Supreme Court said in National Labor Relations Board v. Mackay Co., 1938, 304 U.S. 333, 351, 58 S.Ct. 904, 913, 82 L.Ed. 1381: "The Fifth Amendment guarantees no particular form of procedure; it protects substantial rights."
Finally the complainant attacks Maximum Rent Regulation No. 28 as arbitrary and capricious in employing the maximum rent date method of rent control. Under this method it is said that landlords who have refrained from raising their rents are penalized and that no assurance is afforded that the owners of housing accommodations will receive a fair return from their properties. Complainant does not contend that the maximum rent date method is inappropriate as applied to his particular area. He protests the validity of the method as such.
It is clear that Section 2(b) of the Emergency Price Control Act authorizes the maximum rent date method of rent control and that it was the intention of Congress that the act should authorize it.[18] Under this method rents are fixed at the levels which landlords and tenants have voluntarily agreed upon after free bargaining in a competitive market on a date prior to the time when defense activities have affected the housing market. In Wilson v. Brown, Em.App., 137 F.2d 348, decided today, we have fully considered and upheld the validity of this same maximum price regulation as applied to complainants in the Chicago Defense-Rental Area. See also our opinions in Chatlos v. Brown, Em. App., 136 F.2d 490, decided May 28, 1943, and Lakemore Co. v. Brown, Em.App., 137 F.2d 355, decided today.
It is suggested that the provisions of the regulation restricting the eviction of tenants[19] render it invalid. These provisions are authorized by Section 2(d)[20] of the act, however, and we think that they are appropriate to effective rent regulation *663 and are not unreasonable. The regulation permits recovery of possession for any one of six specific purposes and in any other situation in which the landlord shows that the tenant's eviction will not be inconsistent with the purposes of the act or regulation or likely to result in the evasion thereof.
The complainant raises a number of other objections to the act, the regulation and the registration form, No. DD2-D, which he and other landlords are required to file. We have considered all of these objections but find them so wholly lacking in merit as to require no discussion here.
The complaint is dismissed.
Chief Judge VINSON participated in the consideration and decision of this case in conference, but resigned before the opinion was prepared.
NOTES
[1] 7 F.R. 4913.
[2] 50 U.S.C.A. Appendix § 901 et seq.
[3] Housing of Federal Employees in Washington, D. C., in May, 1941, Serial R. 1374, United States Bureau of Labor Statistics (1941).
[4] Characteristics of Housing: 1940, United States Summary, Series H-5 No. 1, Bureau of the Census (1940).
[5] The Price Administrator states that during World War I Great Britain, France, Italy, Germany, Austria, Hungary and Russia all put measures of rent control into effect. Likewise during the present war Great Britain and other nationes have done the same.
[6] 50 U.S.C.A. Appendix § 901(a).
[7] 50 U.S.C.A. Appendix § 902(b).
[8] 50 U.S.C.A. Appendix § 902(c).
[9] See Louisville & Nashville R. R. Co. v. Mottley, 1911, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297, 34 L.R.A.,N.S., 671 (abrogation of contracts for use of free passes on interstate railroads); Phila., Balt. & Wash. R. R. v. Schubert, 1912, 224 U.S. 603, 32 S.Ct. 589, 56 L.Ed. 911 (abrogation of contracts making the acceptance of benefit payments under a company relief plan a bar to an action for damages); Norman v. B. & O. R. Co., 1935, 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352 (abrogation of pre-existing contracts requiring payment of bonds in gold coin); Wright v. Union Central Life Ins. Co., 1938, 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (extension of contract period for redemption of mortgaged property).
[10] 7 F.R. 3936.
[11] 50 U.S.C.A. Appendix § 924.
[12] In Kittrell v. Hatter, 1942, 243 Ala. 472, 10 So.2d 827, the Supreme Court of Alabama upheld the exclusive jurisdiction of this court under the Emergency Price Control Act. See Lockerty v. Phillips, May 10, 1943, 63 S.Ct. 1019, 87 L.Ed. ___.
[13] Illustrations are Sec. 3224, Rev. Stat., 26 U.S.C.A. Int.Rev.Code, § 3653 (a), upheld in Steinhagen Rice Milling Co. v. Scofield, 5 Cir., 1937, 87 F.2d 804, certiorari denied 300 U.S. 663, 57 S.Ct. 494, 79 L.Ed. 872; Sec. 265 of the Judicial Code, 28 U.S.C.A. § 379, upheld in Toucey v. New York Life Ins. Co., 1941, 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100, 137 A.L.R. 967; and the Norris-LaGuardia Act, 29 U.S.C.A. § 107, upheld in Lauf v. E. G. Shinner & Co., 1938, 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872.
[14] 50 U.S.C.A. Appendix § 923.
[15] § 1300.208 et seq., 7 F.R. 3938 et seq.
[16] § 1300.202 et seq., 7 F.R. 3937 et seq.
[17] § 1300.235 et seq., 7 F.R. 3940.
[18] See the opinions of this court in Chatlos v. Brown, Em.App., 136 F.2d 490, decided May 28, 1943, and Wilson v. Brown, Em.App., 137 F.2d 348, decided today.
[19] § 1388.1806, 7 F.R. 4915.
[20] 50 U.S.C.A. Appendix § 902(d).