**AVANT et al. v. BOWLES, Price Administrator.**

**BUSH et al. v. SAME.**

Nos. 63, 64.

United States Emergency Court of Appeals.

Heard at Atlanta Oct. 20, 1943.

Decided Dec. 31, 1943.

Charles J. Bloch, of Macon, Ga., for complainants.

Sol M. Linowitz, Chief, Court Review Rent Branch, of Washington, D. C. (George J. Burke, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Herbert H. Bent and Harry H. Schneider, Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MAGRUDER, Judge.

On August 28, 1942, a large number of landlords in Macon, Georgia, filed with the Price Administrator a consolidated protest against Maximum Rent Regulation No. 26 for the Macon Defense-Rental Area. At the request of the protestants, the Administrator on September 18, 1942, granted them an extension of time within which to present further evidence. On April 17, 1943, the Administrator issued an order incorporating into the record certain statistical materials and economic data and affording protestants an opportunity to present rebuttal evidence within thirty days thereafter. No such rebuttal evidence was filed, and on June 8, 1943, the Administrator issued an order, with accompanying opinion, denying the consolidated protest. The several protestants then split into two groups, each of which filed a separate complaint in this court under § 204 of the Emergency Price Control Act of 1942, 56 Stat. 31, 50 U.S.C.A.Appendix, § 924. The two cases were consolidated for argument and disposition by order of this court. Since there was only one protest proceeding, the transcripts in the two cases are identical. The issues raised by the two complaints are the same, with the exception that the complainants in No. 64 present an additional issue, which we shall subsequently refer to.

Maximum Rent Regulation No. 26 was issued June 30, 1942, effective July 1, 1942. 7 F.R. 4905. For housing accommodations rented on April 1, 1941, the rental prevailing on that date is fixed as the maximum rent. We have already upheld this method of rent control as a generally fair and equitable method of establishing maximum rents in a defense-rental area. Chatlos v. Brown, Em.App., 1943, 136 F.2d 490 (1943). Section 5 of the regulation provides several grounds on which a landlord may file a petition for adjustment to increase the maximum rent otherwise allowable.

Aside from questions as to the constitutionality of the Act, 50 U.S.C.A. Appendix, § 901 et seq., the main issue in these cases is whether the Administrator was arbitrary or capricious in selecting April 1, 1941, as the rent-freezing date.

The Macon Defense-Rental Area consists of the counties of Bibb, Houston and Peach, Georgia. In 1940 this area had a population of 105,464 persons, of whom 57,865 resided in the city of Macon. The first effects of defense activities on rentals in the area were not felt prior to October 12, 1940, on which date plans for the construction of Camp Wheeler and a naval fuse loading plant were announced. Construction of the camp was begun on December 12, 1940, and of the fuse loading plant on February 5, 1941. Construction of Cochran Field, an Army Air Corps basic flying school, was begun on February 6, 1941. On September 1, 1941, there was begun the construction of the Georgia Air Depot, a repair and supply base for all Army aircraft in the southeastern states. War contracts awarded by the Government totalled $34,000,000 by the end of August, 1941, and by June, 1942, this total had reached $48,000,000, a sum nearly double that of the value of all products manufactured in the area in 1939.

By February, 1941, 10,500 persons were employed on military construction projects. The impetus of defense construction and increased manufacturing activities caused a great migration into the area. In this connection the Administrator stated in his opinion: "The number of civilian migrants attracted to Macon during the first year of the defense program was roughly equal to its population gain during the entire decade of the 1930's. From December 1940 to June 1941, 5,000 persons migrated to the

Area. This figure reached 8,000 by December 1941, and by June 1942 had increased to 20,000 persons. These figures do not include military personnel who numbered 10,000 as early as May 1941, and by June 1941 numbered 17,000. Between April 1940 and June 1942 the population of the City of Macon increased at least 25 percent. By April 1941 this vast influx of migrants—construction, manufacturing, and service workers, and military and naval personnel and their families—drawn to the Macon Area by its defense activities, had created a tremendous demand for housing accommodations. In addition, rising employment and increased income led to a greatly increased housing demand by families which previously had been forced to double up or to live in substandard or unsuitable dwellings. This increased demand, combined with the housing demand of defense workers and of military personnel, created an acute housing shortage in the Area by April 1941."

In fact, as the Administrator pointed out, the supply of housing accommodations in the area was inadequate even prior to the expansion resulting from defense activities. The habitable vacancy rate in the area in February, 1941, was 0.5% and only 0.2% of the dwelling units were vacant and available to white tenants. It was easy to be foreseen that the acute housing shortage would result in widespread rent increases. The Administrator found:

"The critical housing shortage resulting from the impact of the defense program led to widespread rent increases in the Macon Area. From October 1939 to April 1941, 47 out of every 100 white tenants in the City of Macon had rent increases. Although the average increase was 18.8 percent, 24 out of every 100 increases were from 25 to 35 percent. For those dwellings renting for less than $15 per month, 75 percent of the white tenants had rental increases averaging 21.7 percent. The rent increases during this period resulted in a rise of 8.8 percent in the index of average rentals for all white tenants, and a rise of 16 percent in the index of average rentals for those paying $15 or less per month. ·

"Rent increases after the maximum rent date were so large and widespread as to be clearly inconsistent with the Emergency Price Control Act of 1942. Between April 1941 and June 1942 more than 3 out of every 4 white tenants in Macon had their rents increased. Although the average rent increase was 22.5 percent, 1 out of every 3 increases was from 25 to 45 percent. The index of average rentals for white tenants rose 16.8 percent during this period.

"The full impact of defense activities on the rental market in the City of Macon is reflected in the rent increases that occurred between October 1939 and June 1942. During this period 94 out of every 100 white tenants had rental increases. While the average increase was 30.6 percent, 21 out of every 100 increases were from 40 to 70 percent. The index of average rents for white tenants rose 27 percent during this period. Rent increases were more severe for white than non-white tenants during this period and generally were greater in the lower rental brackets."

The Administrator concluded that though some rent increases had occurred up to April 1, 1941, as a result of the increased demand for housing accommodations created by the early stages of defense activities, these increases were "neither so severe nor so widespread as to warrant the establishment of maximum rents as of a date when such early rent increases began." He found, however, that the widespread increases subsequent to April 1, 1941, "were clearly inconsistent with the purposes of the Act." On the record before us we cannot say that the Administrator was arbitrary or capricious in selecting April 1, 1941, as the rent-freezing date. As we pointed out in the Chatlos case, this happens to be the very date suggested by Congress itself in § 2(b) of the Act, 50 U.S. C.A.Appendix, § 902(b), as one on which rentals then prevailing would probably not reflect increases due to the impact of defense activities. The objective of the maximum rent date method of rent stabilization is to roll back and freeze rentals as of an earlier date and at levels which landlords and tenants had worked out for themselves by free bargaining in a competitive market, prior to the time when defense activities had injected into the market an abnormal factor resulting, or threatening to result, in rent increases inconsistent with the purposes of the Act.

▋ In their protests, complainants aver that the Administrator should not have frozen rents as of a date earlier than March 1, 1942. Rents in this area on April 1, 1941, they say, "were approximately 76 per cent. of the average of the rentals for the years 1920-38, and on September 1, 1941 were ap-

proximately 90 per cent. of that 18 year average." A similar argument was made in Spaeth v. Brown, Em.App., 1943, 137 F.2d 669, at page 670 and rejected by us in the following language: "But, says the Complainant, these increased rentals are still relatively lower than those which prevailed in Cleveland between 1919 and 1931 and which now prevail in some other communities. This may be conceded, but the answer is that it is wholly immaterial. Congress clearly authorized the Administrator to stabilize rents at the level at which they stood in the particular area in question on the most recent date which did not reflect increases resulting from defense activities. It did not intend that all rent control should be suspended until rentals reached the higher levels of an earlier generation."

Furthermore, complainants contend that the average rental increases between September 1, 1940, and March 1, 1942, just about kept pace with the general increase in the cost of living, and therefore that the regulation should not have rolled. back the rentals beyond the date of March 1, 1942. In the Spaeth case we answered this type of argument also. 137 F.2d at page 671.

 Particularly, complainants object that the Administrator, having selected April 1, 1941, as the basic date, failed to make provision for adjustments upwards, in accordance with § 2(b) of the Act, on account of increased real estate taxes since that date and increases in the cost of labor and materials for the maintenance and repair of housing accommodations. As we pointed out in the Chatlos case [136 F.2d 491], a rent regulation may be "generally fair and equitable" notwithstanding the lack of such adjustment. Increased costs in some particulars may be offset by greater gross rentals due to decline in vacancy rates and by savings resulting from economies of operation which are possible in war time. Net operating income under rent

control is a more significant figure than isolated items of operating costs. The Administrator incorporated in the record a survey of housing operations in the area made by the Accounting Division of the Office of Price Administration covering the operating experience during 1939-42 for three apartment houses with 76 dwelling units and 329 small structures with 396 dwelling units. He found that the data contained in the survey were generally representative of rental housing operating experience in the area. An estimate was made of one year's operating experience under rent control. The survey indicated that for small structures, net operating income (before interest and depreciation) would be considerably larger under one year of rent control than in 1939 and slightly larger than in 1940. For apartment house operations the increase in net operating income under one year of rent control was forecast to be much greater than for small structures. Complainants introduced no rebuttal evidence to controvert the findings of this survey.[1] We are unable to find that the maximum rents established by the regulation were generally unfair and inequitable by reason of the failure of the Administrator to make an adjustment on account of cost increases since April 1, 1941.

 In No. 64 the complainants make the additional point that the housing accommodations owned by them were on April 1, 1941, occupied by tenants under non-cancellable yearly leases executed prior to September 1, 1940, and covering the period from September 1, 1940, to August 31, 1941. They say that the regulation is unfair and inequitable as to them and as to a considerable number of other landlords similarly situated because their rents were in effect frozen at a date considerably earlier than April 1, 1941, and they were unable to take advantage of the upward trend of rents in Macon up to April 1, 1941, a

---

[1] At the oral argument counsel for the Administrator handed us a subsequent survey dated September 29, 1943, entitled "Income and Expenses under Rent Control—Macon Rental Housing," compiled by the Program and Analysis Branch, Rent Department, Office of Price Administration. This study, which covered a much larger number of dwelling units, tends to confirm the estimates in the earlier survey which is incorporated in the record; indeed, it indicates that the actual experience under rent control is more favorable to the landlords in the Macon area than the earlier estimate. Net operating income both for apartment houses and small structures during one full year of rent control was shown to be greater than in 1941 as well as in 1939 and 1940. This is significant because in 1941 landlords had the benefit of the substantial increases of rents which took place after April 1, 1941, the rent-freezing date. Maximum rents were not rolled back until the regulation went into effect on July 1, 1942.

trend which, as the Administrator found, had not proceeded to a point inconsistent with the purposes of the Act until subsequent to April 1, 1941.

Of course, it is inherent in the maximum rent date method of rent stabilization that a landlord who had increased his rents just prior to the freeze date keeps the increase, whereas a landlord who increased his rents after the freeze date must relinquish such increase. See Northwood Apts., Inc., v. Brown, Em.App., 1943, 137 F.2d 809, 813, 814. The assumption in the regulation is that the rentals in effect on the rent-freezing date were the product of general market conditions of supply and demand in a normal market not unduly influenced by war activities and thus in effect represented bargaining valuations of the properties for rental purposes as ' of that date made by landlords and tenants themselves. But the Administrator recognized that the general formula might be unfair to landlords whose premises were occupied on the rent-freezing date under long-term leases, which might have been executed a considerable period prior to the rent-freezing date when market conditions were greatly different. Accordingly the Administrator provided in § 5 of the regulation that a landlord might petition for an increase of the maximum rent otherwise allowable on the ground that there was in force on April 1, 1941, a written lease for a term commencing on or prior to April 1, 1940, requiring a rent substantially lower than the rent generally prevailing in the area for comparable housing accommodations on the maximum rent date. In his opinion denying the protests herein the Administrator explained: "In providing for adjustment in such cases the Administrator sought to establish an adjustment provision for those landlords who had been deprived of an opportunity to bargain with respect to rental for their accommodations within a reasonable time prior to the maximum rent date. A landlord who entered into a lease during the one year period prior to April 1, 1941 did so with reference to a limited period, including the maximum rent date. Landlords with leases in effect more than one year before the maximum rent date, however, were not afforded the same opportunity of bargaining within a reasonable period prior to April 1, 1941. The protestants have not shown that the Administrator's determination to provide for an adjustment of rents only in cases where the lease was in force for more than one year prior to April 1, 1941 was not entirely reasonable and in accordance with the purposes of the statute."

The Administrator had to draw the line somewhere, in framing the above adjustment provision. We cannot say that he acted arbitrarily or capriciously in drawing the line where he did. That a considerable portion of the housing accommodations in the area were rented under yearly leases commencing September 1, 1940, may have accounted for the fact that on April 1, 1941, the general level of rents had not risen to an extent inconsistent with the purposes of the Act. If this factor had not been present, the Administrator might well have found it necessary to prescribe an earlier freezing date.

■■ Complainants have also attacked the constitutionality of the Act on various grounds, most of which were considered and disposed of in our opinion in Taylor v. Brown, Em.App., 1943, 137 F.2d 654, certiorari denied, Nov. 15, 1943. We shall refer briefly to one point which was not discussed by us in the Taylor case, namely, that the statute violates the due process clause of the Fifth Amendment in that it fails to accord to landlords affected by a rent regulation the right to a formal hearing before the issuance of the regulation.

Congress itself by direct legislative act, and without notice and hearing, could have frozen the rents as of a given date. In fact, it did just that in legislation applicable to the District of Columbia. 55 Stat. 788, D.C.Code 1940, § 45—1601 et seq. In the Emergency Price Control Act of 1942 Congress validly delegated to the Price Administrator the power to issue rent regulations legislative in character within the framework of the legislative standards laid down for the Administrator's guidance. We see no reason why the due process clause should be read as imposing a requirement that the administrative agency must give notice and hearing to all the landlords in the defense-rental area before issuing a regulation in pursuance of its delegated power. In Bi-Metallic Inv. Co. v. State Board of Equalization of Colorado, 1915, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372, an order of the Board of Equalization increasing the valuation of all taxable property in the city of Denver was held not to be in violation of the due process clause of the Fourteenth Amendment because no

opportunity was given to the taxpayers to be heard before the order was made. Mr. Justice Holmes, speaking for a unanimous court, said (239 U.S. at page 445, 36 S.Ct. at page 142, 60 L.Ed. 372): "Where a rule of conduct applies to more than a few people, it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule."

For state court decisions to similar effect see State Board of Milk Control v. Newark Milk Co., 1935, 118 N.J.Eq. 504, 179 A. 116; Spokane Hotel Co. v. Younger, 1920, 113 Wash. 359, 194 P. 595.

In the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., unlike the Emergency Price Control Act, Congress expressly prescribed that the Administrator of the Wage and Hour Division should hold a hearing before issuing an order prescribing minimum wages. Opp Cotton Mills v. Administrator, 1941, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624. The Packers and Stockyards Act, 7 U.S.C.A., § 181 et seq., expressly required the Secretary of Agriculture to hold a "full hearing" before issuing an order fixing maximum rates to be charged by market agencies in the stockyards. Morgan v. United States, 1938, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129. Complainants also cite Porter v. Investors' Syndicate, 1932, 286 U.S. 461, 52 S.Ct. 617, 76 L.Ed. 1226. This case related to proceedings by an administrative agency to revoke an individual permit to do business, for violation of the state's "blue sky law." It may well be that the due process clause requires notice and hearing to the individual to be affected before the exercise of such a power, quasi-judicial in nature; but the case is not controlling in the situation now before us.

The Emergency Price Control Act undoubtedly contemplates that the Administrator shall exercise an informed judgment before issuing a rent regulation. He is given adequate investigatory powers under § 202 of the Act. Section 2(b) requires that before proceeding to establish maximum rents in any particular area, (1) the Administrator must form a judgment that it is necessary to stabilize or reduce rents within the particular area in order to effectuate the purposes of the Act; (2) he must issue a declaration setting forth the necessity for, and recommendations with reference to, such stabilization or reduction; (3) he must wait sixty days after the issuance of such declaration to see whether rents have been stabilized or reduced by state or local regulation, or otherwise, in accordance with his recommendations; and (4) he must form a judgment that rents have not been so stabilized or reduced within that period of sixty days. The Administrator may then proceed by regulation or order to establish such maximum rents as in his judgment will be generally fair and equitable and will effectuate the purposes of the Act. To the extent that he deems practicable the Administrator is directed to give consideration to recommendations made by state and local officials. In the war emergency facing the country, Congress might well have thought that this measure of deliberation prior to the issuance of a rent regulation was all that was practicable under the circumstances. It might well have thought that the situation would not wait upon the giving of a formal hearing by the Administrator to the thousands of persons affected, and judicial review, before a rent regulation should become legally obligatory. We do not think that the procedure established in the Act for the fixing of maximum rents violates the due process clause of the Fifth Amendment. See Fuchs, Procedure in Administrative Rule-Making (1938) 52 Harv.L.Rev. 259; Note, American Economic Mobilization (1942) 55 Harv.L.Rev. 427, 489-91. Cf. Rottenberg v. United States, 1 Cir., 1943, 137 F.2d 850.

The complaints are dismissed.