**ROCKCLIFFE REALTY CORPORATION v. BOWLES, Price Administrator.**

**No. 222.**

United States Emergency Court of Appeals. Heard at New York Oct. 1, 1945. Decided Oct. 22, 1945.

Joseph Harrison, of Newark, N. J., for complainant.

Stanley D. Metzger, of Washington, D. C. (Richard H. Field, Gen. Counsel, Jacob D. Hyman, Associate Gen. Counsel, and Warren L. Sharfman, of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

MARIS, Chief Judge.

The housing accommodation here involved is apartment 6M in the Rockcliffe Apartments, an apartment house situate in Montclair in the Northeastern New Jersey Defense-Rental Area. The maximum rent date for that area as provided by the Rent Regulation for Housing [1] is March 1, 1942. On that date the rent for apartment 6M was $155 per month. The complainant, which owns and operates the Rockcliffe Apartments, sought to have this rent adjusted upward to $215 per month. To the Area Rent Director and the Regional Administrator the complainant argued that the rent for apartment 6M on the maximum rent date was substantially lower than at other times of the year because of seasonal demand or seasonal variations in rent for its apartments and consequently that it was entitled to an upward revision pursuant to the provisions of Section 5(a) (7) of the Regulation. In the protest filed with the Price Administrator the complainant urged as an additional and independent ground for upward adjustment that the rent for apartment 6M on the maximum rent date was materially affected by peculiar circumstances and consequently that Section 5(a) (11)[2] of the Regulation was applicable. The Administrator found the complainant's proof inadequate to sustain either ground relied upon for adjustment and denied the protest. This complaint followed.

We turn first to the question whether the Administrator erred in determining that the complainant had failed to make out a case for adjustment of the rent of apartment 6M on the ground that the allegedly low rent was caused by "off-season" renting within the meaning of Section 5(a) (7) of the Regulation. That section provides, inter alia, that

"Any landlord may file a petition for adjustment to increase the maximum rent otherwise allowable, only on the grounds that:

\*　　\*　　\*　　\*　　\*　　\*

"(7) the rent on the date determining the maximum rent was substantially lower than at other times of year by reason of seasonal demand, or seasonal variations in the rent, for such housing accommodations \* \* \*."

The Administrator has upon numerous occasions announced the standards which must be met by a landlord located in an area having a customary moving date in order to entitle him to an upward adjustment in rent under the provisions of Section 5(a) (7) of the Regulation.[3] In conformity with these standards a landlord seeking an upward adjustment under Section 5(a) (7) must establish that the term of the lease in effect on the maximum rent date commenced after the customary moving date, in this case October 1st; that the rent on the maximum rent date was both substantially lower than the rent would have been for the subject accommodations had they been rented on the usual annual renting date and also lower than the rent for comparable accommodations in the area on the maximum rent date; that the building in which the subject accommodations are located had, on the maximum rent date, a pattern for October 1st occupancy; and that the subject accommodations had such a pattern.

The complainant does not attack these standards as unreasonable but asserts that insofar as possible it has met them by adequate proof. The facts upon which the complainant relies are that the Rockcliffe Apartments were completed in November, 1940, with 102 apartments available for occupancy. Between November, 1940 and October 1, 1941 the complainant had rented but 53 of these apartments. Apartment 6M was one of 49 apartments still vacant on October 1, 1941. On October 8, 1941 the complainant executed a lease for apartment 6M for a two year term commencing November 1, 1941 and expiring September 30, 1943. The lease was renewed to September 30, 1944.

As we have seen, the Administrator has laid down five standards which the complainant must meet in order to entitle it

---

[1] 9 F.R. 11335.

[2] 9 F.R. 8054, effective July 17, 1944. Section 5(a) (11) was added to the Regulation by Amendment 29, subsequent to the filing of the complainant's petition for adjustment.

[3] See Andrew Arms, Inc. v. Bowles, Em. App., 1945, 150 F.2d 972.

to an upward adjustment. However, the issue in this proceeding is narrowed by several concessions which the Administrator has made. He states that for the purposes of this proceeding the building and the subject unit may be assumed to have an October 1st occupancy pattern and that it may also be assumed arguendo that the rent for apartment 6M is lower than the rent for comparable accommodations in the area on the maximum rent date. It is an undisputed fact that the lease for apartment 6M commenced after October 1st. This leaves as the sole subject of our inquiry the question whether the Administrator erred in finding that the complainant did not present satisfactory proof that the maximum rent for apartment 6M as established by the lease executed on October 8th is substantially lower than it would have been had the apartment been rented for a term commencing October 1st.

The complainant is necessarily without direct evidence as to the experience of "in-season" rental of apartment 6M since the "off-season" lease with which we are dealing was the first and only lease for that apartment. However, such evidence as there is available for argument by analogy is most unfavorable to the complainant's position. All the apartments in the building which are on the same vertical line as apartment 6M are designated by the letter "M" together with their floor number. Apartments 7M, 2M, 5M and 4M were leased for terms commencing November 1, 1940, December 1, 1940, January 20, 1941 and March 15, 1941, respectively, and apartment 3M was leased for a term commencing March 1, 1942. Although all were "off-season" leases, the four first named being executed prior to October 1, 1941 and the one last named subsequent to October 1st, each was leased at a rental satisfactory to the complainant. It would appear from this that the effect of "off-season" leasing was not necessarily a drop in rentals as compared to those procurable for "in-season" leasing.

■ It is a fact that apartment 6M was available for occupancy in ample time to permit an "in-season" lease for a term commencing October 1, 1941 but that it nevertheless remained without a tenant. Although it appears to be a reasonable assumption to make we need not determine whether the desire of the complainant to procure maximum occupancy was responsible for the allegedly low rentals. Suffice it to say that the complainant has not met the burden of proof which the law casts upon a petitioner for an adjustment.[4] We conclude that the Administrator was not arbitrary or capricious in denying the complainant's petition for an upward adjustment of rentals insofar as Section 5(a) (7) is concerned.

Our next inquiry is whether the Administrator's determination that the complainant was not entitled to an upward adjustment of rent pursuant to Section 5(a) (11) of the Regulation was improper. That section provides for an adjustment upon the ground that:

"The rent on the date determining the maximum rent was materially affected by peculiar circumstances and as a result was substantially lower than the rent generally prevailing in the defense-rental area for comparable housing accommodations on the maximum rent date."

The complainant urges that the rent for apartment 6M was fixed under "peculiar circumstances" within the meaning of Section 5(a) (11). The circumstances relied upon are that the Rockcliffe Apartments was a new apartment building with luxury type apartments, representing a substantial investment, and entailing heavy operating expenses. It was completed in November 1940, after the October 1, 1940 renting season had passed. When the next renting season, October 1, 1941, passed there were still 49 vacancies. The complainant faced the prospect of considerable losses until another renting season arrived. These factors taken in combination amount to "peculiar circumstances" according to the complainant.

■ We agree with the Administrator that these were not "peculiar circumstances" within the meaning of the regulation. The complainant was confronted by the not unusual problem of making a choice between insisting on high rents even at the risk of a high vacancy rate or of accepting less satisfactory rents in order to obtain maximum occupancy. It might speculate and wait for satisfactory rents or it might play safe and accept immediately available tenants who offered to pay lower rents. We think that these are normal circumstances of bargaining between landlords and tenants. Perhaps the economic pressure is especially heavy upon a landlord

---

[4] Gale Realty Corporation v. Bowles, Em.App., 1943, 139 F.2d 496.

who is confronted with the problem of obtaining tenants for all the units in his building at the same time. This, however, does not change the essential nature of the landlord's problem as one of bargaining in the available market.

In his statement of considerations the Administrator explained that the underlying purpose of Section 5(a) (11) of the Regulation was "to permit adjustments where conditions surrounding the making of the rental agreement were such as to negate the existence of ordinary bargaining considerations." [5] We think that the situation on October 8, 1941, when the complainant executed the lease for apartment 6M, was one which may appropriately be described as presenting "ordinary bargaining considerations."

The complainant argues that if the circumstances in which it found itself on October 8, 1941 were not "peculiar" within the meaning of the regulation then the phrase "peculiar circumstances" is meaningless and the regulation fails to comply with the mandate of Section 2(c) of the Emergency Price Control Act as amended by the Stabilization Extension Act of 1944. That amendment reads:

"Under regulations to be prescribed by the Administrator, he shall provide for the making of individual adjustments in those classes of cases where the rent on the maximum rent date for any housing accommodations is, due to peculiar circumstances, substantially higher or lower than the rents generally prevailing in the defense-rental area for comparable housing accommodations. * * *"

It is clear that Congress left to the Administrator the duty of determining the classes of cases to which this adjustment provision was to apply. In an interpretation of Section 5(a) (11) issued by the Administrator July 15, 1944, and revised August 11, 1944,[6] the Administrator gave examples of types of cases in which adjustments may be made under the section. Adjustments were allowed by the Administrator where the rents were fixed by a woman inexperienced in business matters and acting under emotional stress; by a landlord who was mentally incompetent; by inaction due to the lack of anyone in authority to act pending a title dispute; by a receiver whose sole concern was to keep the premises occupied and prevent vandalism during the temporary period of the receivership; by a landlord who was unable to assure the tenant a period of occupancy because of a condemnation proceeding then pending; by a landlord who permitted the tenant to occupy temporarily a more expensive apartment at the rental of a less expensive apartment until one of the latter type became available for occupancy; by an agent who through a mistake in his office rented the housing accommodation at less than his instructions from the owner authorized.

The circumstances relied upon by the complainant do not fit into any one of these types of cases. Congress had been informed prior to the enactment of the amendment to Section 2(c) as to the types of cases which the Administrator had in mind as requiring an additional provision for permitting adjustments on the ground of circumstances of special hardship. Mr. Carson, Deputy Administrator for Rent Control, addressed a letter to Congressman Outland, a member of the Banking and Currency Committee before which the proposed amendment was then under consideration. This letter was read by Congressman Outland to Congress during the debate on the bill in the House.[7] The types of cases outlined in the letter are substantially similar to those later set forth by the Administrator in the interpretation. It is specially significant that not one of the examples thus given to Congress dealt with a type of case in which a landlord accepted a lower rent in order to avoid vacancies. We conclude that the complainant has failed to bring itself within the terms of Section 5(a) (11) and that adjustment under this subsection was properly denied.

A judgment will be entered dismissing the complaint.

[5] Pike & Fischer, OPA Service, p. 200:-393D.

[6] Pike & Fischer, OPA Service, p. 200:-1731.

[7] 90 Cong.Rec. 5678.