**KUSKIN & ROTBERG, Inc., v. PORTER, Price Administrator.**

**No. 262.**

United States Emergency Court of Appeals.

Heard at Philadelphia, Pa., Dec. 7, 1945.

Decided Feb. 28, 1946.

Louis Rotberg, of Newark, N. J., for complainant.

Stanley D. Metzger, Atty., Office of Price Administration, of Washington, D. C. (Richard H. Field, Gen. Counsel, Jacob D. Hyman, Associate Gen. Counsel, and Warren L. Sharfman, Chief, Court Review Rent Branch, all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

McALLISTER, Judge.

In this case, we are concerned with the construction to be given Section 5(a) (11) [1] of the Housing Regulation which provides for an increase of maximum rent otherwise allowable, on the ground that the rent on the date determining the maximum rent was materially affected by peculiar circumstances and, as a result, was substantially lower than the rent generally prevailing in the defense-rental area for comparable housing accommodations on the maximum rent date.

Complainant, the owner of an apartment building located in East Orange, New Jersey, leased three apartments in July 1939, to Charles Fox, Maurice Fox, and Mr. and Mrs. Allan Miller, respectively. Charles Fox, the father of Maurice Fox and of Mrs. Miller, leased the largest apartment, consisting of six rooms; Maurice Fox took an apartment of two rooms, and the Millers, one of four rooms. The leases were entered into as a result of negotiations which were opened by Maurice Fox and the Millers who came to complainant with a proposition of renting apartments for themselves as well as on behalf of their father, Charles Fox. They advised complainant that the father would take the six-room apartment, only if they also became tenants in the building, with the eventual result that they induced complainant to lease the Maurice Fox and Miller apartments to them at rentals much lower than comparable rentals on the maximum rent

---

[1] 9 F.R. 8054.

date (which was March 1, 1942), and to lease the six-room apartment to Charles Fox, at an undisclosed rental, on the understanding, however, that complainant accepted them all as tenants only as long as Charles Fox remained as tenant of the apartment which was leased to him.

Approximately two years after the execution of the aforementioned leases, and while all the parties were continuing in occupancy thereunder, the Millers informed complainant that they desired a five-room, instead of a four-room apartment, at $105 per month—a comparatively low rental—and that unless they received such an apartment at that rental, all three tenants would move on September 30, 1941. On the promise that Charles Fox would renew his lease for the six-room apartment from October 1, 1941, for a two-year period, complainant entered into a lease with the Millers, for the same period, for the five-room apartment at $105 per month.

On June 27, 1941, subsequent to the execution of the new lease to the Millers, and prior to the beginning of the period therein provided, Charles Fox gave notice that he was going to surrender and vacate his apartment, whereupon complainant immediately sent Maurice Fox a registered letter requesting him to vacate his apartment on September 30, 1941, in accordance with the terms of his lease unless he desired to stay at a higher rent. Negotiations followed, as a result of which Charles Fox agreed to lease again the six-room apartment for an additional two-year term, and Maurice Fox was given a lease for a similar period for his apartment, on the condition that whenever Charles Fox moved, the Maurice Fox and Miller apartments were to be vacated.

Two years later, Charles Fox notified complainant that he would vacate, and actually did vacate, his apartment on September 30, 1943. Thereupon, complainant, in lieu of requesting the other parties to vacate, filed a request with the Rent Director asking for authorization to raise the maximum rents of the other two apartments leased to Maurice Fox and the Millers. Acting upon complainant's request, the Rent Director issued orders raising maximum rent for the Miller apartment from $105 to $125 per month, and for the Maurice Fox apartment from $50 to $65 per month. Subsequently the Regional Director reversed the orders of the Rent Director, and later issued an order denying

complainant's application for review. Thereafter, complainant filed protest with the Administrator requesting relief on the ground that the rentals paid by the lessees on the date determining the maximum rent were materially affected by "peculiar circumstances," and as a result were substantially lower than the rent generally prevailing for comparable housing accommodations on the maximum rent date. The protest, based on the "peculiar circumstances," was predicated upon Section 5 (a) (11) of the Regulation.

It is agreed, as was found in the report and recommendations of the Board of Review to which the protest was referred, that the three leases executed in 1941, and in force on March 1, 1942—the maximum rent date in the area—as well as the prior leases made in 1939, were negotiated as one unit and that the rents were fixed on the understanding that the leases were to run concurrently and that all were to terminate if any of the three tenants should fail to continue in occupancy. There is no question that the rents, provided in the leases of the two apartments in question, were below comparability; that the order of the Rent Director, which was afterward reversed by the Administrator, raised such rents only to the level of comparable rents; and that the reason for the reduction of rents—or the leasing of the two apartments at such low rents—in 1939, and in 1941, was because of the concurrent renting of the three apartments in accordance with the understanding of the parties heretofore mentioned.

The majority of the Board of Review concluded that the rents of the two apartments in question were materially affected by "peculiar circumstances" on the maximum rent date, and that, as a result, the rents therefor were substantially lower than the rents generally prevailing for comparable housing accommodations on that date. It was accordingly recommended that the protest be granted, and that the maximum rents previously approved by the Rent Director be established. The Administrator, in declining to follow the recommendations of the majority of the Board of Review, and in denying the protest, held that the landlord's main concern at the time of the execution of the leases was the threat of having a large apartment continuously vacant; that the bargaining between the landlord and tenants was not influenced by any circumstances

not present in the usual rental bargain; that the leases were agreed upon after considerable negotiations between the parties, involving considerations of mutual economic advantage which are usually present in competitive bargaining; and that complainant had failed to demonstrate that the rents provided in the leases had been affected by peculiar circumstances.

The sole question presented to us for decision is whether, within the intendment of the statute authorizing the issuance of the Regulation, the rentals provided for in the leases in question were materially affected by peculiar circumstances, and as a result were substantially lower than the rent generally prevailing in the area for comparable housing accommodations on the maximum rent date.

In arriving at our determination, some discussion of the statutory authority for the Regulation may be helpful. When Congress sanctioned the maximum rent date method of rent stabilization as a generally applicable formula for determining maximum rents, it recognized that some provision for adjustments and exceptions would be essential in formulating workable regulations, and accordingly provided in Section 2(c) of the Act, 50 U.S.C.A.Appendix, § 902(c), that the regulations "may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of this Act." See Hillcrest Terrace Corp. v. Brown, Em.App.1943, 137 F. 2d 663. Some time thereafter, Congress apparently felt that many unusual circumstances, which needed remedy, were being overlooked by the Administrator, and to ameliorate such conditions, added, in the Stabilization Extension Act of 1944, the following mandatory provision to Section 2(c) of the Act:

"Under regulations to be prescribed by the Administrator, he shall provide for the making of individual adjustments in those classes of cases where the rent on the maximum rent date for any housing accommodations is, due to peculiar circumstances, substantially higher or lower than the rents generally prevailing in the defense-rental area for comparable housing accommodations, and in those classes of cases where substantial hardship has resulted since the maximum rent date from a substantial and unavoidable increase in property taxes or operating costs."

Pursuant to the foregoing amendment, the Administrator issued a regulation to effectuate the purpose thereof, which contains, among other provisions, Section 5(a) (11)[2] which provides that any landlord may file a petition for adjustment to increase the maximum rent otherwise allowable, on the ground that:

"The rent on the date determining the maximum rent was materially affected by peculiar circumstances and as a result was substantially lower than the rent generally prevailing in the defense-rental area for comparable housing accommodations on the maximum rent date."

It was on the theory that the rents charged on the maximum rent date for the apartments here in question were materially affected by "peculiar circumstances" resulting in their being substantially lower than the rent generally prevailing in the defense-rental area at that time for comparable housing accommodations, that the apartment owner filed its complaint against the Administrator's denial of its protest.

In his statement of considerations[3] accompanying the Regulation issued pursuant to the amended statute, the Administrator set forth that the purpose underlying Section 5(a) (11) was "to permit adjustments where conditions surrounding the making of the rental agreement were such as to negate the existence of ordinary bargaining considerations." In his interpretation[4] of the foregoing section of the Regulation, the Administrator gave examples of types of cases in which adjustments may be made under the section. These examples provided for adjustments where the rents were fixed by a woman inexperienced in business matters and acting under emotional strain; by a landlord who was mentally incompetent; by inaction due to the lack of anyone in authority to act pending a title dispute; by a receiver whose sole concern was to keep the premises occupied and prevent vandalism during the temporary period of the receivership; by a landlord who was unable to assure the tenant a period of occupancy because of a con-

---

2 9 F.R. 8054.
3 Pike & Fischer, OPA Service, P. 200:-393D.

4 Pike & Fischer, OPA Service, P. 200:-1731.

demnation proceeding then pending; by a landlord who permitted the tenant to occupy temporarily a more expensive apartment at the rental of a less expensive apartment until one of the latter type became available for occupancy; by an agent who through a mistake in his office rented the housing accommodation at less than his instructions from the owner authorized. See Rockcliffe Realty Corp. v. Bowles, Em.App. 1945, 151 F.2d 339.

It is asserted that the circumstances relied upon by the complainant herein do not bring it under any of the types of cases as set forth in the interpretation of the Administrator, or within the intendment of the Act, or Regulation issued thereunder.

As to the type of cases embodied in the Administrator's interpretation of Section 5(a) (11), it is claimed that Congress had been informed prior to the enactment of the amendment to Section 2(c) of the types of cases which the Administrator had in mind as requiring provisions for permitting adjustments on the ground of circumstances of special hardship; and it is implied that Congress, accordingly, adopted the principles thus outlined by the Administrator as a guide and rule in formulating the amendment to the Act. To sustain this contention, it is submitted that pending the enactment of the amendatory legislation, the Deputy Administrator for Rent Control, of the Office of Price Administration, had addressed a letter to Congressman Outland, a member of the Banking and Currency Committee, before which the proposed amendment was then under consideration, and the letter was thereafter read to Congress during the debate upon the bill in the House of Representatives.[5] The letter stated, among other matters, that the Office of Price Administration was proposing to amend the Regulation by adding a further ground for individual adjustments when the rent on the date determining the maximum rent date "was materially affected *by special hardship circumstances* and as a result was substantially lower than the rent generally prevailing in the defense-rental area for comparable housing accommodations on the maximum rent date." (Italics supplied.) It is to be noted that the subsequent amendment to the statute provided for the making of rent adjustments in those cases where the rent on the maximum rent date was, *"due to peculiar circumstances,* substantially higher or lower than the rents generally prevailing in the defense-rental area for comparable housing accommodations, and in those classes of cases where substantial hardship had resulted since the maximum rent date from a substantial and unavoidable increase in property taxes or operating costs." (Italics supplied.)

From a comparison of the proposed amendment of the Regulation by the Administrator with the actual amendment of the Act, it is clear that Congress decided not to limit the making of rent adjustments to cases "affected by special hardship circumstances," as construed in the above mentioned communication of the Deputy Administrator to Congress; but, rather, it determined upon the broader basis of directing adjustments to be made where the low rent on the maximum rent date was "due to peculiar circumstances." Nothing is mentioned in the Act, as amended, about "special hardship circumstances"; and when the amendment mentions cases, "where substantial hardship had resulted since the maximum rent date," it is concerned only with instances in which such hardship had resulted "from a substantial and unavoidable increase in property taxes or operating costs."

It is, therefore, not to be considered that Congress intended that the phrase, "peculiar circumstances" in the amendment was to be interpreted in the same way that "special hardship circumstances" was interpreted in the letter of the Deputy Administrator, which was read during the debate; nor that the various examples of such hardship, as therein suggested, constitute a criterion for the determination of what were cases involving "peculiar circumstances," within the meaning of the amendment. While such examples would undoubtedly fall within the classification of cases where the rent was substantially lower "due to peculiar circumstances," nevertheless, it could not be said that all such peculiar circumstance cases could be considered as being encompassed within the limits, express or implied, of "hardship circumstances," as comprehended in the Deputy Administrator's letter.

It is intimated that, since the letter, indicating the Administrator's interpretation of the phrase, "special hardship circumstances"—as used in the proposed amend-

ment to the Regulation—was read to Congress during the debate, such a construction by the Administrator should be taken as disclosing what Congress must have intended by the language which it used in the amendment. There would be more virtue in this argument if Congress had used the phrase, "special hardship circumstances," in the amendment to the Act. But, instead, they used "peculiar circumstances"—a fact that would seem to deprive the contention, in this regard, of any convincing vigor.

What, then, are "peculiar circumstances," as used in the amendment and the Regulation? The Administrator has held that, in determining whether there are "peculiar circumstances" within the meaning of Section 5(a) (11), it is to be considered "whether the circumstances, relied upon by the landlord, are abnormal, that is, not usually present in the normal rental bargain. If there are such abnormal circumstances and if, by reason thereof, the rent is shown to be substantially below the rents generally prevailing in the Area for comparable accommodations, an adjustment in the rent may be made under Section 5(a) (11)." In the Matter of Two Sutton Place South, Inc., Docket No. RPA-II-241-P. 2 Op. & Dec., O.P.A., 3206.

■ Using the foregoing reasonable interpretation by the Administrator of the term, "peculiar circumstances" as well as his declaration appearing in the statement of considerations above mentioned that the underlying purpose of Section 5(a) (11) of the Regulation was to permit adjustments where conditions surrounding the making of the rental agreement were such as to negate the existence of ordinary bargaining considerations, we proceed to consider the application of the term, "peculiar circumstances," to the facts in the case before us. In this connection, it may be recalled that the theory upon which maximum rents are fixed in the first place, is that the rental bargain existing on the maximum rent date between the landlord and tenant, is "frozen."

"Rentals are * * * rolled back and frozen as of an earlier date and at levels which landlords and tenants had worked out for themselves by free bargaining in a competitive market, prior to the time when defense activities had injected into the market an abnormal factor resulting, or threatening to result, in rent increases inconsistent with the purposes of the Act."

Chatlos v. Brown, Em.App.1943, 136 F.2d 490, 493. "It is clear that Section 2(b) of the Emergency Price Control Act authorizes the maximum rent date method of rent control and that it was the intention of Congress that the act should authorize it. Under this method, rents are fixed at the levels which landlords and tenants have voluntarily agreed upon after free bargaining in a competitive market on a date prior to the time when defense activities have affected the housing market." Taylor v. Brown, Em.App.1943, 137 F.2d 654, 662. In R. E. Rappeport & Sons v. Bowles, Em. App. 1946, 153 F.2d 445, it was pointed out that, while under the Hotel Regulation, the "freeze date rental" might subsequently be reduced by the Administrator to the level of rents generally prevailing for comparable accommodations during the base period, nevertheless, under the Housing Regulation, the rental bargain, as of the maximum rent date, between the landlord and tenant, was frozen. In other words, under the maximum rent date method of rent control, the Regulation leaves the parties in the situation in which it finds them—with the bargain they have made. "In the generality of cases, * * * in a normal competitive market each landlord presumably pursues the rental policy which in his judgment is most economically advantageous to him. The maximum rent date method of rent control recognizes the resulting differentials in rents, and preserves them." Lakemore Co. v. Brown, Em.App.1943, 137 F.2d 355, 358. See also Northwood Apartments v. Brown, Em.App.1943, 137 F.2d 809, 813.

Here, the Administrator asserts that the rentals for the two apartments in question on the maximum rent date were the result of a free bargain between the landlord and the tenants of those apartments, and that, consequently, the landlord is bound by that bargain, and, therefore, not entitled to any increase in rentals.

■ But, in this case, it is clear that the landlord included in his bargain for the rent of the two apartments, the further bargain that such apartments would be immediately vacated at any time that the third apartment of six rooms leased to Charles Fox was vacated. The third apartment was vacated. If the tenants of the other two apartments did not vacate, but continued on at the same rental, the landlord would be clearly deprived of the fruits of his rental bargain, contrary to the whole theory

upon which the maximum rent date method of rent control is based; for the chief consideration—the whole substratum—upon which the low rental concessions were granted to the two tenants in question, disappeared when the third tenant vacated his apartment. See Adams, Rowe & Norman, Inc., et al. v. Bowles, Em.App.1944, 144 F. 2d 357.

The inescapable conclusion from the proof in this case follows that a transaction whereby three interrelated families simultaneously negotiate with a landlord for the rental of three separate accommodations by three separate leases is an unusual and uncommon transaction; and where distinctly low rentals are solicited by the lessees of two of such accommodations in consideration of their securing another lessee for a third large apartment, and such low rentals are agreed to by the landlord on condition that if the large apartment is vacated, all other apartments shall be similarly vacated, it must be held that the circumstances upon which the landlord relies for an order vacating the premises or increasing the rents of the two remaining apartments, "are abnormal, that is, not usually present in the normal rental bargain." In Matter of Two Sutton Place South, Inc., supra.

Since the circumstances surrounding the rentals on the maximum rent date were abnormal, it is our conclusion that the rent on that date was, due to peculiar circumstances, substantially lower than the rents generally prevailing in the defense-rental area for comparable housing accommodations, and, under the statute and the Regulation, complainant is accordingly entitled to individual adjustments of the rentals of the two apartments in question.

Our determination herein is readily distinguishable from that in Rockcliffe Realty Corp. v. Bowles, supra. There, the landlord was not deprived of the fruits of his bargain, but was only held to the rentals provided in the agreement with its tenants in effect on the maximum rent date. While those rentals were low, they had been accepted in order to avoid high vacancy rates in the apartment building. The court held that such a situation presented only ordinary bargaining considerations. Obviously, the facts in the Rockcliffe case and in the present controversy are entirely dissimilar.

In consideration of the foregoing, a judgment will be entered setting aside the order of the Administrator denying complainant's protest and remanding the case to the Administrator for further proceedings not inconsistent with this opinion.