**HUNT v. PORTER.**

No. 340.

United States Emergency Court of Appeals.

Heard at Los Angeles Sept. 20, 1946.

Decided Nov. 20, 1946.

Andrew J. Copp, Jr., of Los Angeles, Cal. (H. Dexter McKay, of Los Angeles, Cal., on the brief), for complainant.

Lewis Leeds, Atty., of New York City (Richard H. Field, Gen. Counsel, Carl A. Auerbach, Associate Gen. Counsel and Harry H. Schneider, Chief, Court Review Rent Branch, all of Washington, D. C., all of OPA, on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

MARIS, Chief Judge.

The complainant is the owner of an apartment building located at 405 West Adams Boulevard in the City of Los Angeles known as the Holton Arms Apartments. He petitioned for upward adjustment of the rents of 33 of the accommodations in the building under Section 5(a) (11)[1] of the rent regulation upon the ground that the rents on the maximum rent date were adversely affected by peculiar circumstances. The Area Rent Director of the Los Angeles Defense-Rental Area denied the petition and the Regional Administrator denied an application for review. The complainant thereupon filed a protest which after consideration by a board of review and upon its recommendation was denied by the Price Administrator. The present complaint in this court followed. It raises as the sole question for our consideration whether the Administrator erred in deciding that the circumstances of complainant's case were not peculiar within the meaning of Section 5(a) (11) of the regulation.

The facts were fairly stated by the board of review in its report to the Administrator, as follows:

"The subject building is located in a district which a quarter century or more ago was one of the best residential districts in Los Angeles. Erected in 1918, 'it bore,' according to protestant, 'the enviable reputation of being the most desirable and best appointed apartment house in Los Angeles' during the early years of its history. Protestant purchased the property in 1919 and operated it for three years, catering to a wealthy clientele. The 5-room units were allegedly rented from $250 to $350 per month, with gross rentals of about $54,000 a year. In 1922 he sold the building, equipment and furnishings for $275,000, and did not reacquire the property until twenty years later.

"In the meantime the property suffered a sharp decline in fortune. Los Angeles rapidly expanded; other and more exclu-

[1] Section 5. Adjustments and other determinations—

(a) Grounds for increase of maximum rent.—Any landlord may file a petition for adjustment to increase the maximum rent otherwise allowable, only on the ground that: * * *

(11) Peculiar circumstances. — The rent on the date determining the maximum rent was materially affected by peculiar circumstances and as a result was substantially lower than the rent generally prevailing in the defense-rental area for comparable housing accommodations on the maximum rent date.

sive residential sections were developed; great 'top flight' apartment hotels with luxurious services and more modern appointments arose to house the wealthy and discriminating; and the neighborhood of Holton Arms gradually became a commercial and rooming house district. * * * The owners of the subject building ran into serious financial difficulties during the depression; the second trust deed was foreclosed in 1937, and the property remained vacant until 1940, when it was purchased by Frank W. Babcock. By this time, although the building was structurally sound, its equipment and furnishings were becoming shabby and outmoded. The place obviously needed thorough rehabilitation. A few thousand dollars were spent at this time to put the units in habitable condition, but the amount was far from adequate to restore the building to first-class condition. In March 1940, Mr. Babcock leased the building, furnishings, and equipment to Ruth Berry (now Ruth Berry Richards) for a term of five years terminable on ninety days' notice in the event Mr. Babcock should sell the property. Mrs. Berry agreed to pay as rent 40% of the gross rentals received from the operation of the apartment building, with a minimum guaranty of $650 per month. She associated with her as comanager Herman P. Kranz; and with great industry they set about cleaning up, redecorating, and renting the apartments. Within about two months they had rented all the apartments at the schedule of rentals about which the protestant now complains, and they kept the apartments filled during their two years' management. In July 1942, Mr. Babcock sold the property to the protestant, who thus became owner for the second time and who took over the management. Protestant nowhere discloses the price at which he reacquired the property, but it was presumably based on the then condition of the property and its current earnings."

The circumstances which the complainant contends were peculiar in this situation were, first, that the apartment building was vacant from 1937 to 1940, resulting in deterioration and loss of reputation, and, second, that the management of Mrs. Berry from 1940 to 1942 was incompetent, re-

sulting in the filling of the apartment building with tenants at unduly low rents.

We do not think that the fact that the building was vacant for three years and thereby deteriorated and suffered loss of reputation was a peculiar circumstance within the meaning of Section 2(c) of the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 902(c), or Section 5(a) (11) of the Rent Regulation. On the contrary it is not uncommon for landlords, particularly in times of depressed rents, to withhold their accommodations from the rental market until conditions become more favorable. There is nothing to suggest that this is not what happened here. Indeed the complainant's charge of mismanagement against Mrs. Berry is based principally upon the fact that when she took over the building in 1940 she proceeded too promptly to fill it up with tenants at too low rents.

Nor do we see any merit to the contentions that the deterioration of the building here involved was peculiar and that Mrs. Berry's conduct of the building amounted to such reckless mismanagement as also to be a peculiar circumstance. We can add nothing to what the board of review said as to these contentions, as follows:

"We do not think there is anything peculiar in the decline in rental value of Holton Arms. This apartment building has merely experienced the fate of numerous other pretentious houses in our rapidly growing cities, which have suffered by the changing character of the surrounding neighborhood and by the deterioration and decay which are the common lot of all. A quarter century is a long span in the life of any apartment hotel; and unless such an enterprise keeps pace with the procession by constant modernization to meet the changing demands for public favor, it must inevitably fall behind. Added to normal deterioration in use, Holton Arms also suffered a long period of abandonment and neglect.

"Nor do we see anything in the nature of the lease from Mr. Babcock to Mrs. Berry which would conduce to reckless management or unwarranted reduction in rents. From the owner's viewpoint, a lease which immediately converted a nonproduc-

tive property into a property producing a minimum of $650 per month (adequate to pay not only carrying charges but debt amortization as well), with the possibility of still greater return, and which allowed him to terminate the arrangement in the event he obtained a favorable opportunity of sale, cannot be characterized otherwise than as a shrewd, far-sighted bargain. From the lessee's viewpoint, there was every inducement to charge all the traffic would bear, in the interest of maximum returns. Of course, no lessee under such circumstances could afford to hold the property idle, faced with a minimum obligation of $650 per month; but there was certainly no reason why the lessee should not make every reasonable effort to obtain rents sufficient to cover more than the minimum guaranty—since 60 percent of such excess would become the lessee's share. We think that the steps which the lessee took under the circumstances were reasonable and proper, and that, but for the fortuitous intervention of an unprecedented demand for housing facilities at inflationary rents, any other procedure might well have been fatal. The protestant's suggestion that the lessee should have improved the apartments gradually and held out for $200 per month for the 5-room units might have been sound advice to a speculator with adequate resources to assume the risk; but it does not seem to us to be suited to a tenant of limited means with a heavy monthly obligation to meet. Protestant's wisdom is the wisdom of hindsight. If indeed the apartments had been rented at the extravagant figures for which the protestant contends, it would seem likely, on the basis of his allegations, that he would never have reacquired the property at all—since Mr. Babcock's dissatisfaction with the returns on the property is stated to have been the motivating reason for the sale. The protestant's right to rent adjustments in this matter can rise no higher than that of Mr. Babcock and Mrs. Berry would have been if the property had remained in their hands.

"We have here the simple situation in which a landlord was faced with the choice of holding out for higher rents at the risk of many vacancies, or of renting the units at the highest rates then obtainable. The landlord elected the latter course in the exercise of business judgment which seems at the time to have been sound and proper, however it may be viewed in the light of subsequent events. In the leading case of Rockcliffe Realty Corporation v. Bowles, Em.App., 151 F.2d 339, 342, decided October 2, 1945, the Emergency Court of Appeals discussed at length the legislative history and meaning of the 'peculiar circumstances' amendment to the Housing Regulation. Holding that the amendment affords no ground for relief under circumstances similar to those here presented, the court said: "It is specially significant that not one of the examples thus given to Congress (indicating the scope of the proposed amendment) dealt with a type of case in which a landlord accepted a lower rent in order to avoid vacancies."

"Even if the Babcock-Berry lease be regarded as the exercise of poor business judgment and the operations thereunder as mismanagement—which, in our opinion, is an unfair appraisal of the situation, it would still not present a case of 'peculiar circumstances' under the regulation. The Administrator, in interpreting section 5 (a) (11), has stated that cases involving 'simple mismanagement or poor business judgment on the part of the landlord or the landlord's agent' do not fall within the definition of 'peculiar circumstances.' See Interpretation 5(a) (11)-I,B, Rent Regulation for Housing with Official Interpretations (as revised July 1, 1945), at page 80."

A judgment will be entered dismissing the complaint.