**SHAKER PARKWAY CO. et al. v.
PORTER, Price Administrator,
and five other cases.**

Nos. 283–288.

United States Emergency Court of Appeals.

Heard at Chicago, Ill., May 27, 1946.

Decided Nov. 4, 1946.

Franklin D. Hepburn, of Detroit, Mich. (Hepburn, Coy & Gringle, of Detroit, Mich., on the brief), for complainants Shaker Parkway Co. et al., and Miller Homes, Inc., et al.

Charles J. Rivet, of New Orleans, La., for complainants . Superior Homes, Inc., et al.

Sol M. Linowitz, Asst. Gen. Counsel, O. P.A., of Washington, D. C. (Richard H. Field, Gen. Counsel, O.P.A., and Jacob D. Hyman, Associate Gen. Counsel, O.P.A., both of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

MAGRUDER, Judge.

These complaints, consolidated for hearing, raise the common question as to the validity of a provision of the Rent Regulation for Housing forbidding landlords of priority-constructed housing from exacting or retaining security deposits in connection with the rental of such housing accommodations.

Complainants are severally the owners and landlords of priority-constructed housing in various defense-rental areas. The accommodations in question were first rented after the applicable freeze date, and the respective maximum rents were established under § 4(f) of the Rent Regulation for Housing (8 F.R. 7322), providing that, for housing accommodations newly constructed with priority rating from the United States or any agency thereof for which the rent is .approved by the United States or any agency thereof, the maximum rent shall be the rent so approved.

In the various applications to the War Production Board and the National Housing Agency and in the formal approvals by those agencies of the rents to be charged, there was no indication, either expressly or impliedly, of any authorization to collect a security deposit in addition to the rents specifically prescribed. During the latter part of 1943, upon inquiry by several complainants, they were informed by a regional representative of the National Housing Agency that, according to the advices of the general counsel, there were no regulations of the Agency prohibiting security deposits. "The entire matter of such deposits is under consideration and we expect that a regulation clarifying this matter will be issued shortly. In the meantime, since there is no prohibition against it, you may require such a deposit." Thereafter the practice of requiring security deposits was established by several of the complainants. Others of the complainants had required such deposits from the outset without seeking approval thereof by the government agencies concerned. .These deposits varied in amount from $10 to $200 and in method of administration.[1]

---

[1] In the report of the Board of Review, the deposit agreements are described as follows:

"An examination of the various security deposit agreements used by protestants reveals that some provide that the deposits shall be kept in a separate account in a designated bank; that the deposit shall be returned in full if at the termination of the lease the tenant returns the property to the landlord in the same good order and condition as when received, usual wear and tear excepted; that in the event the premises are not returned in good order, the lessor shall have the right to retain the deposit or such part thereof as may be required to cover the necessary repairs; that if lessor and lessee cannot agree upon the amount of the damage, the lessor shall have the right to refer the matter to a licensed architect appointed by the lessor to estimate the amount of damage under the provisions of the lease, that the architect's determination shall be final and binding on both parties, and that his fees shall be borne equally by lessor and lessee. Oth-

The position of the National Housing Agency on the subject of security deposits in priority-constructed housing accommodations was finally clarified by Mr. John B. Blandford, Jr., Administrator, in a letter dated December 7, 1943, in which he stated:

"Through the recent discussions with the Office of Price Administration, it is our impression that a clarification of the whole situation relating to security deposits has resulted. As you probably know, the National Housing Agency has never issued any rules or regulations relating to security deposits or authorizing their collection, and some of the difficulties in connection with security deposits have resulted from an earlier situation where the respective responsibilities of various government agencies were not clearly defined. As a result of the recent discussions, it has become clear that the Office of Price Administration has full jurisdiction with respect to the whole matter of security deposits, and that the OPA is solely responsible for any enforcement proceedings as may be desirable to prevent or remedy such charges in connection with security deposits or such other charges as relate to the matter over which the OPA has full jurisdiction and control and which the OPA in its discretion may deem undesirable or improper. Needless to say, the National Housing Agency by every means within its power always has and always will continue to comply with and seek to induce others to comply with any outstanding OPA rules and regulations having a bearing upon charges in connection with war housing."

The Price Administrator, as early as September 12, 1942, issued an interpretation to the effect that the requirement of a security deposit from the tenant constituted an addition to the "rent" as that term is defined in the Act and in the regulation.[2] In three injunction suits brought by the Administrator based on this interpretation, two district courts ruled against him (Brown v. Bayview Manor Homes, Inc., D.C.E.D.Va.1943, 51 F.Supp. 557; Bowles v. Sylbern Homes of Connecticut, Inc., D.C.Conn.1944, 55 F.Supp. 287), and one district court ruled in his favor (Bowles v. American Victory Homes, Inc., D.C.N.J. 1944, 2 Op. & Dec. (OPA) 5051).

To clear up the doubt that had developed in the matter, the Administrator issued Amendment 33 to the Rent Regulation for Housing, effective September 1, 1944, adding § 2(d) to the regulation with specific reference to security deposits (9 F.R. 10633). As applied to priority-constructed housing, the rents of which were established by § 4(f) of the regulation, § 2(d) (4) provided that "no security deposit shall be demanded, received, or retained." In a statement of considerations accompanying the issuance of Amendment 33 (Pike & Fischer OPA Service, p. 200:393-H), the Administrator stated that the principal purpose of the amendment was to clarify the position which the Administrator had theretofore taken with reference to the charging of security deposits under the rent reg-

er agreements provide that the extent of the damages shall be determined by the lessor after securing at least two bids for the repair of damage. Still other agreements leave this determination of the amount to be retained entirely to the lessor. Others make no explicit provision for ordinary wear and tear but condition the return of the deposit upon the lessee's surrendering the premises 'in equally good condition as when received'."

2 See Interpretation M.R.-X, Pike & Fischer OPA Service, p. 200:1122:

"On April 1, 1941, the maximum rent date, L rents a house to T as a tenant from month to month at a rental of $40 per month. No deposit of any kind is required from T. On June 1, 1942, L demands from T, or from a succeeding ten-

ant, a deposit of $15 to be returned upon the termination of the tenancy, provided that no obligation of the tenancy has been violated.

"The demand or receipt of the $15 deposit constitutes a violation of the Regulation. The furnishing by T of such deposit, even though the money is to be returned upon performance of the obligations of the tenancy, constitutes part of the consideration demanded or received for the use of the leased premises and as such constitutes rent. This is the case even though interest is paid by L on the deposit.

"Where, however, a deposit of the same amount was required on the maximum rent date, there has been no increase in the rent and no violation of the Regulation."

ulations. "The Administrator consistently has taken the position that a security deposit is rent, as that word is defined in the regulations, and that a landlord may not demand, receive or retain a security deposit in addition to the maximum rent unless such security deposit was provided for in the lease or other rental agreement by which the maximum rent was established." The Administrator made the following explanation of the provision relating to priority-constructed housing:

"Where the maximum rent is established under Section 4(f) of the Housing Regulation, which applies to housing accommodations newly constructed with priority rating and having a rent approved by the agency granting priority, the amendment provides that no security deposit may be demanded, received, or retained. In the main this is a clarification of the position which the Administrator consistently has taken with reference to this class of housing. Under the rent regulation the maximum rent for such housing may not be in excess of the rent approved by the agency granting priorities. Since such approvals have not made provision for a security deposit, the Administrator has taken the position that the landlord may not receive such deposit in addition to the approved rent. The amendment changes the effects of the present regulation only to the extent of specifically prohibiting the demand, receipt, or retention of a security deposit in such cases."

The statement concluded that, to the extent that the provisions of the amendment "compel or may operate to compel changes in established rental practices, such provisions are necessary to prevent circumvention or evasion of the rent regulations and the Act."

On October 12, 1944, the Administrator issued Amendment 37 (9 F.R. 12414) making certain changes in detail in § 2(d) of the regulation. The provision with reference to security deposits in priority-constructed housing was left unchanged, except that it now became § 2(d) (5), reading: "Where the maximum rent of the housing accommodations is or initially was established under section 4(f), no security deposit shall be demanded, received, or retained." In his statement of considerations accompanying the issuance of Amendment 37 (Pike & Fischer OPA Service, p. 200:-393-M), the Administrator stated that, "where the maximum rent is established under Section 4(f) of the Housing Regulation, which applies to housing accommodations newly constructed with priority rating and having a rent approved by the agency granting priority, the prohibition on retention of security deposits heretofore received has been left unchanged, since the September 1, 1944 amendments were a reaffirmation and clarification of the Administrator's previous position in such cases." The statement repeated the recital that, to the extent that the provisions of the amendment "compel or may operate to compel changes in established rental practices, such provisions are necessary to prevent circumvention or evasion of the rent regulations and the Act." Section 2(d), as amended by Amendment 37, is copied in the footnote.[3]

---

[3] (d) Security deposits—(1) General prohibition. Regardless of any contract, agreement, lease or other obligation heretofore or hereafter entered into, no person on or after September 1, 1944, shall demand or receive a security deposit for or in connection with the use or occupancy of housing accommodations within the Defense-Rental Area or retain any security deposit received prior to or on or after September 1, 1944, except as provided in this paragraph (d). The term "security deposit," in addition to its customary meaning, includes any prepayment of rent except payment in advance of the next periodic installment of rent for a period no longer than one month.

(2) Maximum rent established under section 4(a) or (b). Where the maximum rent of the housing accommodations is or initially was established under section 4(a) or (b), no security deposit shall be demanded, received, or retained except in the amount (or any lesser amount) and on the same terms and conditions (or on terms and conditions less burdensome to the tenant) provided for in the lease or other rental agreement in effect on the date determining the maximum rent established under section 4(a) or (b).

(3) Maximum rent established under section 4(c) or (d). Where the maximum rent of the housing accommodations is or initially was established under section 4(c)

It will be noted that, by definition of "security deposit" in § 2 (d) (1), the term does not include "payment in advance of the next periodic installment of rent for a period no longer than one month." Hence, such prepayment is permitted. Also, provision is made in § 2(d) (7) for authorization to require a security deposit not in excess of $10 "to secure the return of movable articles."

Thereafter, on various dates, the present complainants filed their protests against § 2(d) as applied to priority-constructed housing. The protests were consolidated, and considerable evidence on behalf of the protestants and of the Administrator was incorporated in the record. The consolidated proceeding was submitted to a Board of Review, which filed a lengthy and detailed report recommending that the protests be denied.

On November 14, 1945, the Administrator issued his orders denying the protests, after which the present complaints were duly filed in this court.

■ We think that the restriction or prohibition of security deposits is within the statutory authority of the Price Administrator, and that the complainants have not sustained the burden of satisfying us that the provisions of § 2(d) of the regulation here under attack were arbitrary or capricious or not in accordance with law.

■ Section 302(g) of the Act, 56 Stat. 36, 50 U.S.C.A.Appendix, § 942(g), broadly defines the term "rent" as meaning "the consideration demanded or received in connection with the use or occupancy or the transfer of a lease of any housing accommodations." In § 13(a) (10) of the rent regulation, the Administrator has defined "rent" as used in the regulation in language substantially the same as that of the statutory definition (8 F.R. 7322, 9 F.R. 10634). The question is not what the term "rent" may mean for other purposes, or under other statutes; but what it means as used in the Price Control Act and the rent regulations thereunder. Making a security deposit in connection with the rental of housing accommodations constitutes both a detriment to the tenant and a benefit to the landlord within the classical definition of "consideration". The tenant forgoes the use of the money and subjects himself to other burdens and risks in making the deposit; the benefits to the landlord are fairly obvious, as the complainants are well enough aware. We are disposed to adopt the consistent interpretation which the Ad-

or (d) no security deposit shall be demanded, received, or retained except in the amount (or any lesser amount) and on the same terms and conditions (or on terms and conditions less burdensome to the tenant) provided for in the lease or other rental agreement under which the accommodations were first rented or in any order heretofore or hereafter issued with reference to such security deposit. Where such lease or other rental agreement provided for a security deposit, the Administrator at any time, on his own initiative or on application of the tenant, may order a decrease in the amount of such deposit or may order its elimination.

(4) Maximum rent established under section 4(e) or (j). Where the maximum rent of the housing accommodations is or initially was established under section 4(e) or (j), no security deposit shall be demanded or received.

(5) Maximum rent established under section 4(f). Where the maximum rent of the housing accommodations is or initially was established under section 4(f), no security deposit shall be demanded, received, or retained.

(6) Maximum rent established under section 4(g) or (h). Where the maximum rent of the housing accommodations is or initially was established under section 4(g) or (h), no security deposit shall be demanded or received, except in the amount (or any lesser amount) and on the same terms and conditions (or on terms and conditions less burdensome to the tenant) provided for in the lease or other rental agreement in effect on September 1, 1944. Where such accommodations are first rented after September 1, 1944, no security deposit shall be demanded, received, or retained.

(7) Deposits to secure the return of certain movable articles. Notwithstanding the preceding provisions of this paragraph (d), any landlord may petition for an order authorizing the demand and receipt of a deposit to secure the return of movable articles. If the landlord shows that he has a special need therefor, the Administrator may enter an order authorizing a security deposit, not in excess of ten dollars, to secure the return of the movable articles specified in the order.

ministrator has made of the term "rent" as used and defined in the Act and in his own regulation—an interpretation reasonable both in the light of the language of the statutory definition and of the purposes of the Act. See United States v. American Trucking Associations, Inc., 1940, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345.

When the extension of the Price Control Act was up for consideration in 1945, the attention of Congress was called to the position the Administrator had taken with reference to security deposits.[4] Representatives of real estate interests offered to the House committee a proposed amendment in these terms: "Nothing contained in the Emergency Price Control Act of 1942 [50 U.S.C.A.Appendix, § 901 et seq.] or in this act and no regulation or order adopted under the authority of either act shall be held to prohibit a security deposit, cash bond, or other appropriate and customary payment to protect an owner of private war housing against unusual breakage or loss." The amendment was not adopted, and Congress extended the Act for another year without any change of the statutory language so far as this matter is concerned (59 Stat. 306). Without attaching too much weight to this bit of legislative history, at least it does not serve to weaken the persuasive force of the Administrator's interpretation of the term "rent" as used and defined in the Act.

It results from the foregoing that even before the date of clarifying Amendment 33, adding to the regulation the specific provisions of § 2(d) dealing with security deposits, it was a violation of the rent regulation for landlords of priority-constructed housing accommodations to require the making of security deposits as a consideration for the renting of such accommoda-

tions in addition to the rents approved by the War Production Board and the National Housing Agency and adopted as the maximum rents by § 4(f) of the rent regulation.[5] Incidentally, it is unquestionable that the authority of the Price Administrator extends to the imposition of maximum rents on priority-constructed housing. See §§ 2(b), 4(a), 302(f) and (h) of the Act. If the rents approved by the War Production Board and the National Housing Agency for priority-constructed housing have become the maximum rents under the Price Control Act, it is only because the Price Administrator by regulation has made them so.[6]

■ Even if it were true that security deposits do not constitute part of the "rent" as that term is used and defined in the Act, there is other statutory authority under which the Price Administrator might restrict or prohibit the exaction of security deposits. Under § 2(d) of the Act, the Administrator is empowered to regulate or prohibit leasing practices which are equivalent to or are likely to result in rent increases inconsistent with the purposes of the Act. Similarly, under § 2(g) of the Act, rent regulations "may contain such provisions as the Administrator deems necessary to prevent the circumvention or evasion thereof."

In his statement accompanying the issuance of Amendment 33, the Administrator makes the formal finding that the new provisions regarding security deposits "have been found necessary to achieve effective rent control and to prevent circumvention or evasion of the rent regulations and the Act." This finding is not without rational support. As an a priori matter, it is not unreasonable to apprehend the danger that security deposits might be mis-

---

[4] Hearings before House Committee on Banking and Currency, 78th Cong., 2d Sess., on H.R.4376, pp. 708–713.

[5] Of course if the landlord charged a rent less than the allowable maximum, the taking of a security deposit might not have constituted a violation of the regulation. The problem would have been presented of assigning a monetary value to the requirement of a security deposit to determine whether the aggregate consideration for the lease was in excess of the allowable maximum. Amendment 33 prohibits the taking of security deposits in 4(f) cases regardless of the amount of rent otherwise charged.

[6] In fact, under § 4(f) of the regulation, the rent approved by the National Housing Agency does not in all cases become the maximum rent. If the priority-constructed housing is first rented after the maximum rent date at a rent less than such approved rent, the lower figure becomes the maximum rent.

used, in ways difficult for the Administrator to police or to control, to produce inflationary consequences prejudicial to effective rent control. We say this without in any way questioning the good faith of these particular complainants; but the good faith of particular landlords is not the determining factor. Furthermore, as a matter of experience, the Board of Review refers to evidence of the abuse of security deposits in many rental areas. "This abuse includes instances in which such landlords made no attempt to return deposits, where deposits were not segregated, cases in which deposits were used for ordinary maintenance expenses, thus shifting to tenant expenses normally borne by landlords, and excessive withholding. Multiple examples of these practices are furnished." The landlord possessing a security deposit has the whip hand in any dispute over the propriety of applying the deposit to some particular item of repair, because for many reasons it may be impracticable for the tenant to assume the burden of litigation to protect his rights.

■ Complainants urge that the provisions of § 2(d) with reference to security deposits are not in accordance with law because they are in violation of § 2(h) of the Act. That section, as amended, 58 Stat. 635, provides that the powers granted to the Administrator shall not be used to compel changes in established rental practices except where such action is affirmatively found by the Administrator to be necessary to prevent circumvention or evasion of rent regulations. But the Board of Review and the Administrator have found, on adequate supporting evidence, that the taking of security deposits had not been established prior to rent control as a characteristic rental practice of the industry generally. In so far as the practice has grown up since rent control among landlords of priority-constructed housing, in extent varying from area to area, such is not an established rental practice within the contemplation of § 2(h) of the Act. Furthermore, even if it were, the Administrator has made the requisite formal finding that, in so far as his restrictions on security deposits may compel changes in established rental practices, such provisions are necessary "to prevent circumvention or evasion of the rent regulations and the Act." As above indicated, we cannot say that such determination by the Administrator is arbitrary or capricious.

■ Nor can we accept complainants' contention that owners of priority-constructed housing constitute a distinct segment of the industry having a special or unique need of requiring security deposits so that it is arbitrary or capricious for the Administrator to outlaw security deposits in their case, whatever may be the justification for so doing as applied to landlords generally. The argument is that, under the stipulated conditions for the granting of priorities to builders of priority-constructed housing, they were required to rent the premises to in-migrant war workers or to give a preference to such workers; that this migratory class of tenants were apt to be more destructive and less responsible than tenants generally; that under the actual conditions of operation it was difficult for landlords to obtain credit ratings upon such tenants; that a security deposit in the hands of the landlord operates as a deterrent to the destructive propensities of tenants.

In answer to the foregoing it is pointed out that, since August, 1945, owners of priority-constructed housing have not been restricted in the class of tenants to whom they might rent their accommodations.[7] Further, the evidence has failed to establish that in-migrant war workers are more destructive or less responsible than other classes of tenants. Nor is it established that the exaction of security deposits has in practice generally had a deterrent effect upon tenants. The Board of Review refers to a sample survey of a group of priority-constructed housing projects distributed throughout most of the rental areas here concerned. As to maintenance and repair expenses, the figures show no significant

---

[7] National Housing Agency Regulation 60-15 (H-1), 10 F.R. 10165, effective August 20, 1945: "All restrictions and controls of the National Housing Agency requiring priority-assisted private war housing to be occupied by eligible war workers, or by other persons engaged in national defense activities, are hereby revoked."

difference between the projects which did, and those which did not, exact security deposits.

Furthermore, even if renting to in-migrant war workers introduced a special problem, the fact is that only a relatively small proportion of such tenants are housed in priority-constructed accommodations. The Administrator points out that, if security deposits were authorized to protect priority housing from in-migrant damage, a fair and impartial administration of the Act would make it impossible to deny the privilege to other categories of housing. The report of the Board of Review observes: "If a general policy of authorizing security deposits were adopted, the work-load of policing controversies arising under them and of protecting against excessive deposits would burden OPA's already over-loaded staff to an extent which would be likely to impair their ability to discharge more important functions."

■ Complainants take particular exception to § 2(d) (5) of the regulation in that it compels the relinquishment by landlords of security deposits received by them under contracts with tenants made prior to the issuance of Amendment 33—contracts which at least some of the complainants had entered into upon the faith of assurances from an official of the National Housing Agency that, in the absence of regulations by that agency forbidding the exacting of security deposits, it was all right to do so. But as we have pointed out above, even before the date of Amendment 33, it was unlawful for this class of landlords to exact security deposits from the tenants in addition to the approved rents. Quite apart from that, and assuming for the sake of the present argument that the rent regulation did not forbid the taking of security deposits until the effective date of Amendment 33, even so, in forbidding the retention of security deposits theretofore taken, Amendment 33 is not retroactive in any unconstitutional sense. Amendment 33 could not have retroactively rendered illegal a theretofore lawful act of taking a security deposit; but, in forbidding the further retention of such a deposit, its operation is prospective, and as we have seen, such prohibition is authorized by § 2(d) and (g) of the Act. That the prohibition may cut across preexisting contracts does not render it invalid. Taylor v. Brown, Em.App.1943, 137 F.2d 654, 659, cert. denied 1943, 320 U.S. 787, 64 S. Ct. 194, 88 L.Ed. 473.

■ Finally, it is contended that § 2(d) [8] of the regulation, in its manner of dealing with security deposits, unlawfully discriminates against landlords of priority-constructed housing in favor of other categories of landlords. In considering the merit of this argument, it is relevant to bear in mind the favorable position § 4(f) accommodations occupy under the rent regulation. The Administrator in § 4(f) has adopted as the maximum rents for such accommodations the rents approved by the War Production Board and the National Housing Agency. It seems to be the fact, or at least there is ample evidence in the record warranting the Administrator's finding, that by and large the approved rents in such cases are higher than the rents generally prevailing on the maximum rent date for comparable accommodations. Notwithstanding this, the Administrator has not reserved the right to reduce such rentals to the level of comparability as he has in other cases pursuant to § 5(c).

It is true, as complainants assert, that priority-constructed housing "is the only type of housing as to which both the taking and retaining of security deposits is completely prohibited, except for the $10.-00 deposit made available by section 2(d) (7) to any landlord". The Administrator's statements accompanying the issuance of Amendments 33 and 37 explain the reasons for the differences in treatment with respect to the different categories of housing accommodations. We think the differing situations and problems presented by the various categories justify differences in the treatment of security deposits.

In the case of housing accommodations, the maximum rents of which are established under § 4(a) of the regulation by a renting on the maximum rent date, if the rental agreement in effect on that day stip-

---

[8] See footnote 3, supra, for the text of § 2(d), as amended by Amendment 37.

ulates for a security deposit, the landlord may continue to demand, receive and retain such a deposit on terms not more burdensome to the tenant than those in effect on the maximum rent date. This comports with the view that security deposits are part of the "rent", as that word is used and defined in the Act and in the regulation; and, being such, they may continue to be demanded under the general freeze formula. On the other hand, if the rental agreement in effect on the maximum rent date did not require a security deposit, none may be demanded, and the § 4(a) landlord may not retain any such deposit even though he received it prior to the date of Amendment 33. In cases of housing accommodations whose maximum rents are established under § 4(e) or (j)—so-called "first rent" cases, where the rent fixed by the landlord becomes initially the maximum rent, subject to subsequent reduction by the Administrator under § 5(c) of the regulation—no security deposit may be demanded or received in the future; but because, prior to Amendment 33 (effective September 1, 1944), the regulations did not prohibit the taking of a security deposit in connection with such first renting, landlords are in such cases permitted to retain a security deposit so received prior to September 1, 1944, subject, however, to the power of the Administrator by proceedings under § 5(c) to decrease the amount of the security deposit or to eliminate it altogether. In the case of public housing accommodations whose maximum rents are established under § 4(g), and housing accommodations operated by the Army and Navy Departments for the use of Army and Navy personnel, whose maximum rents are established under § 4(h), where security deposits were lawfully required for such accommodations prior to September 1, 1944, the practice may be continued thereafter, otherwise not. There is, perhaps, less reason to apprehend misuse of security deposits in these cases; and hence it is not to be expected that the same type of regulation of security deposits is appropriate as in the case of privately operated priority-constructed housing accommodations.

Judgments will be entered dismissing the complaints.