## WOODS v. WILLIAM A. WHITE & SONS.
### No. 73, Docket 21100.

United States Court of Appeals
Second Circuit.

Jan. 17, 1949.

CLARK, Circuit Judge, dissenting in part.

————◆————

Ed Dupree, General Counsel, Hugo V. Prucha, Asst. General Counsel, and Cecil H. Lichliter, Sp. Litigation Atty., Office of the Housing Expediter, all of Washington, D. C., for Tighe E. Woods, Housing Expediter, plaintiff-appellant.

Ebben Schramm, of New York City (Edward I. Byer, of New York City, of counsel), for William A. White & Sons, defendant-appellee.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. The plaintiff as Housing Expediter brought this action against the defendant, a New York City real estate broker, for an injunction and treble damages on account of alleged violations by the defendant of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 901 et seq., and of the Rent Regulation for Housing in New York City Defense-Rental Area, as amended [8 F.R. 13914]. The appeal presents the question whether payments by prospective tenants to the defendant of a commission in addition to the first month's rent for securing apartment leases from a landlord constituted "rent" within the meaning of the Act and Regulation. The further question is presented as to whether the receipt of a commission from tenants constituted an "Evasion" within Section 9(a) of the Rent Regula-

tion. The trial judge held that the defendant was not liable and dismissed the complaint on the merits.

The defendant received commissions from tenants in connection with the leasing of certain apartments at premises 26 East 92nd Street, New York City, in accordance with the following schedule:

| Apt. | Tenant | Commission |
|------|--------|-----------|
| 1A | Anabel Hutchinson | $42.75 |
| 2A | Ann S. Putnam | 67.50 |
| 3B | Gerald L. Austenson | 90.00 |
| 4A | Nancy Pike | 69.75 |
| 5B | Carla Conti | 69.75 |

The defendant also received checks for the initial month's rent from each of the above tenants and transmitted these checks to the landlord, Marjorie Fischer, who was the owner of the premises and had given permission to the defendant along with other brokers to submit to her whatever applications they might have to lease apartments in the building. In accordance with this permission, Mrs. Fischer furnished the defendant and the other brokers with information as to prices and terms of rental and with blue prints showing the layout of the various apartments then under construction.

The trial court found as to all five tenants that prior to leasing, the prospective tenant signed an agreement employing the defendant to act as real estate broker and agreed to pay commissions at the rate established by the Real Estate Board of New York. The defendant prepared all the documents including the leases. The defendant obtained the signature of the tenant to the lease and to the application listing references and forwarded the leases to the landlord for her signature. The latter determined whether the references as reported by the defendant were satisfactory. The executed copy of the lease was returned to the defendant who then forwarded it to the tenant. The landlord did not receive any part of the commissions earned by the defendant as a result of its employment by the tenants.

It was also found that the chief attorney for the Office of Price Administration in the New York City Rental Area, author-ized to render interpretations of the Rent Regulations for the Office of Price Administration, did by letter dated June 8, 1945, authorize an independent broker who was not connected directly or indirectly with the ownership or management of the landlord's property, to charge a prospective tenant a commission for obtaining an apartment for the said tenant not in excess of the minimum rate for such type of renting established by the local real estate board.

On March 1, 1943, and prior thereto it was the practice of the defendant when acting as broker in renting apartments not managed by the defendant to obtain and check references of prospective tenants; to draw leases and obtain signatures of both parties thereto; to obtain and transmit the first month's rent to the landlord and to receive from the landlord its commission.

Anabel Hutchinson, the first of the five tenants we have named, employed the defendant as a broker to obtain an apartment for her and was referred to several apartments. Thereafter, when walking by 26 East 92nd Street she happened to notice that the building was under repair, went in and met Mr. Fischer, who told her that it would soon be ready for occupancy. So far as the record discloses, there was no conversation when she met Fischer regarding the defendant but she went to the latter's office and thereafter obtained Apartment 1A in the way we have already described. It is apparent from the above that the only employment of the defendant was by Mrs. Hutchinson herself and that employment was prior to any knowledge on her part of the apartment or its owner.

Miss Putnam, the second tenant we have named, employed the defendant to get her an apartment and was referred by it to Mrs. Fischer, who showed her an apartment which satisfied her. She then returned to the defendant's office where her references were checked and the lease was drawn and submitted by the defendant to Mrs. Fischer for approval and signature.

The third tenant, Austenson, did not testify, and the Expediter offered no proof as to the details of his rental of Apartment 3B from Mrs. Fischer, other than an ad-

mission by defendant that it had received part payment of the first month's rent from Austenson and had transmitted it to the landlord, and also that Austenson had paid the defendant a commission.

Nancy Pike, the fourth tenant we have named, was found by the court to have been referred to the defendant by Mrs. Fischer after having originally been shown an apartment by the latter and having expressed dissatisfaction with the price. In her case, it cannot be said that the defendant procured an apartment for her, for it did no more than to tell her, after Mrs. Fischer had already conducted leasing negotiations, that she could not get the apartment for less than the price quoted by Mrs. Fischer. Indeed, the services of the defendant to Miss Pike seem to have been wholly for the benefit of Mrs. Fischer in persuading the tenant to pay a higher rent to the landlord than she had before been willing to agree to.

The fifth tenant, Miss Conti, was found by the trial court to have been initially shown various apartments by Mrs. Fischer, who then told Miss Conti to go to the defendant. Miss Conti did so and informed an employee of the defendant that she had seen the apartment, would like to rent it, and that Mrs. Fischer had sent her. She then signed the various application forms, paid the commission and first month's rent to the defendant, and finally received her lease drawn by the latter after her references had been checked and Mrs. Fischer had signed it. We cannot see that the defendant had any part in securing the lease of the apartment for Miss Conti.

The statute and Regulations affecting the issues here presented are set forth in the margin.[1]

---

[1] Section 205(e). "If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may, within one year from the date of the occurrence of the violation, except as hereinafter provided, bring an action against the seller on account of the overcharge. In any action under this subsection, the seller shall be liable for reasonable attorney's fees and costs as determined by the court, plus whichever of the following sums is greater: (1) Such amount not more than three times the amount of the overcharge, or the overcharges, upon which the action is based as the court in its discretion may determine, or (2) an amount not less than $25 nor more than $50, as the court in its discretion may determine: Provided, however, That such amount shall be the amount of the overcharge or overcharges if the defendant proves that the violation of the regulation, order, or price schedule in question was neither willful nor the result of failure to take practicable precautions against the occurrence of the violation.

"For the purposes of this section the payment or receipt of rent for defense-area housing accommodations shall be deemed the buying or selling of a commodity, as the case may be; and the word 'overcharge' shall mean the amount by which the consideration exceeds the applicable maximum price. If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, and the buyer either fails to institute an action under this subsection within thirty days from the date of the occurrence of the violation or is not entitled for any reason to bring the action, the Administrator may institute such action on behalf of the United States within such one-year period. * *. * "

Section 302(g). "The term 'rent' means the consideration demanded or received in connection with the use or occupancy or the transfer of a lease of any housing accommodations."

"Sec. 2. Prohibition against higher than maximum rents—(a) General prohibition. Regardless of any contract, agreement, lease, or other obligation heretofore or hereafter entered into, no person shall demand or receive any rent for or in connection with the use or occupancy on and after November 1, 1943, of any housing accommodations within the Defense-Rental Area higher than the maximum rents provided by this regulation; and no person shall offer, solicit, attempt, or agree to do any of the foregoing. Lower rents than those provided by this regulation may be demanded or received.

"Sec. 9. Evasion—(a) General. The maximum rents and other requirements provided in this regulation shall not be evaded, either directly or indirectly, in connection with the renting or leasing or the transfer of a lease of housing accommodations, * * * by modification of the practices relating to payment of

■ The Expediter says that under Section 13(a)(10) of the Regulation, rent means "any * * * benefit * * * demanded or received for or in connection with the use or occupation of housing accommodations, or the transfer of a lease of such accommodation." He argues from this that the commission was in itself "rent." He also argues that the defendant was a landlord within the terms of Section 13(a)(8) of the Regulation because it received the first month's rent. Both contentions are extreme. It cannot be supposed that the Regulation meant to include commissions as rent where the broker had nothing to do with procuring the tenant for the landlord and the services were primarily in procuring quarters for the tenant. Such commissions would seem to be no more like rent than would be a payment by a tenant to his lawyer to advise him on entering into a lease and to prepare the lease. Indeed, such an extreme argument as is made might even include as rent payments of advertising charges to procure an apartment. It is equally impossible to classify the broker as a landlord where the rent it received passed through its hands as a mere conduit and the money was paid prior to the acceptance of the tenant or the execution of the lease by the landlord. Each rent check was to the order of Mrs. Fischer.

The Expediter argues in general that prior to the date when rent controls were imposed, March 1, 1943, it was the practice for the landlord to pay the commission to a broker who had procured for him a tenant. This practice undoubtedly arose in markets where there was at least some equality of renting opportunity between landlords and tenants. When, however, the housing shortage became acute and the owner of an apartment could rent his premises without the aid of a broker's services but prospective tenants had the greatest difficulty in finding or procuring apartments, services of a broker became relatively unimportant to the landlord though vital to the tenant.

In the case of the first three tenants we have named, Mrs. Fischer needed and received no services in procuring a tenant, nor do we think she was benefited within the meaning of Section 13(a)(10) of the Regulation. The checking of references and preparation of leases were doubtless convenient for the landlord but they are not items for which landlords were accustomed to pay under the former practice, whereby commissions were earned when the broker brought to the landlord a tenant who was able and willing to enter into a lease on the landlord's terms. Neither are they services for which the tenants in the present case would be paying. The work of checking references, drawing leases, and transmitting the first installment of rent was all entirely subsidiary to the main purpose of arranging a lease, for which alone the commission was earned. Such work in fact benefited the broker rather than either of the other parties and was something for which neither of them ever paid commissions. In the case of the tenants Hutchinson, Putnam and Austenson, the commissions were paid solely for their benefit and neither the landlord nor the defendant was liable.

■ In the case of the tenants Pike and Conti the proof indicates that the landlord referred them to the defendant to negotiate their leases. In such a situation we think it may be said that the landlord did employ the broker to arrange leases, in spite of the statements to the tenants that they

commissions or other charges * * * or by tying agreement, or otherwise.

"Section 13(a) (5). 'Person' includes an individual, corporation, partnership, association, or any other organized group of persons, or legal successor or representative of any of the foregoing, and includes the United States or any agency thereof, or any other government, or any of its political subdivisions, or any agency of any of the foregoing.

"Section 13(a) (8). 'Landlord' includes an owner, lessor, sublessor, assignee or other person receiving or entitled to receive rent for the use or occupancy of any housing accommodations, or an agent of any of the foregoing.

"Section 13(a) (10). 'Rent' means the consideration, including any bonus, benefit, or gratuity, demanded or received of or in connection with the use or occupancy of housing accommodations or the transfer of a lease of such accommodations."

would have to pay the commissions. In other words, the broker in these two instances acted as agent of the landlord, and in effect did nothing for the tenant. In the case of the tenants Pike and Conti the landlord became liable for the commissions and the payment of such commissions constituted a benefit to her which comes within the definition of rent under the Act and Regulation.

■ In view of what we have said about the claims on behalf of the tenants Hutchinson, Putnam and Austenson, we do not see how there could have been any evasion of the rent laws forbidden by Section 9(a) of the Regulation. In the case of the tenants Pike and Conti, the attempted shifting of payment of the commissions from the landlord to the tenant where the employment of the broker was on behalf of the landlord may indicate an evasion. Yet the determination of whether the commissions were "rent" of the landlord was somewhat doubtful and we hesitate under these circumstances to hold that there was an evasion, as such a decision might subject the defendant to treble damages, which we think only the District Court should pass upon on remand after considering all of the factors which may be presented to it. It may be noted in this connection that of the nine apartments in the building, one was occupied by Mrs. Fischer, two were rented by her without the aid of any broker, and another was rented through a broker other than the defendant. This would seem to negative any claim that the defendant was the exclusive agent of the landlord and also tend to show that the over-all relationship between defendant and landlord did not involve evasion of the Regulation.

Perhaps we should add that a more precise regulation as to the meaning of "evasion" would clarify situations like the present, where there seem to have been fundamental reasons for changes in the practice relating to the payment of brokers' commissions. In Bowles v. Sisk, 4 Cir., 144 F. 2d 163, there was such a specific regulation adding commissions paid by the buyer to the seller's price, and the court held that the commission was to be taken into account in determining a violation by a broker of the maximum price regulations. An adoption of the extreme contention made by the Expediter might practically outlaw brokers in many situations, for the landlord would not employ them and they would refuse employment by tenants since they could not accept payment from tenants without being subject to suit for treble damages. We believe that such a harsh and unexpected result as this requires a more exactly defined regulation than the one here.

The decision in Bowles v. Ruppel, 3 Cir., 157 F.2d 944, is relied on by the Expediter as subjecting the defendant to liability. There, however, the broker not only regularly collected the rent but arranged a lease under which there were admittedly overcharges. We think the decision has no bearing on the case at bar, for here the issue is whether an overcharge of rent occurred at all.

The decision in United States v. De Porceri, 2 Cir., 161 F.2d 526, also involved a violation of a specific regulation requiring O.P.A. approval of all sales of furniture in connection with the making of a lease. It, therefore, is not in point.

The judgment is affirmed as to the commissions paid by the tenants Hutchinson, Putnam and Austenson, and reversed as to the sums paid by the tenants Pike and Conti, with a remand to the District Court for a determination of the amount of damages in these last two matters.

CLARK, Circuit Judge (dissenting in part).

I agree that there was error as to the tenants Pike and Conti, but for reasons which would require reversal as to the other tenants here and affirmance of Judge Ford's decision in Woods v. Claving Realty Corp., D.C.S.D.N.Y., 77 F.Supp. 533, reversed herewith. It seems to me that the Administrator, by aptly inclusive words in his Regulations, has made provision for a situation which, had he not done so, would represent a sadly unfortunate omission from the general scheme of rent control. For it is quite clear that in this rent area on the crucial "freeze" date real estate

brokers performed, and *were paid by the landlords,* for this service, the charge for which is now being passed on to the tenants. It was a service going beyond the mere finding of a person who wished to rent living quarters; broadly speaking it was the screening, by dependable brokers, of the desirable from the undesirable applicants. How important and necessary the landlords thought this service was is shown rather convincingly in the two instances here singled out for special and, I fear, discriminatory treatment, those of Pike and Conti. For these were two applicants not discovered by brokers, but they, like the rest, were directed to submit to the same screening process. The suggestion that brokers' services had no longer become necessary to the landlords because of the shortage of rents and consequent demand therefor is therefore belied by the record itself. It is also belied by the circumstance—to be noticed by us judicially equally with our notice of the shortage itself—that that shortage had become acute long before the freeze date in 1943, when the landlords were paying for the service.

Hence we have here a service charge, formerly paid by the landlords, but after the establishing of maximum rents passed on to the tenants, as, thus, a clear and obvious increase in the burdens of the latter, contrary to the intent of the rent control program and to the mandate of the regulations as I read them.[1] For they are not cast in terms of conventional definitions of "rent" and of "landlord" (if, indeed, even such definitions could be agreed upon), but contain their own controlling provisions. By these, " 'rent' means the consideration, including any bonus, benefit, or gratuity, demanded or received for or in connection with the use or occupancy of housing accommodations," and " 'landlord' includes an owner * * * or other person receiving or entitled to receive rent [i. e., the thus-defined rent] for the use or occupancy of any housing accommodations." Rent Regulation, §§ 13(a)(10), 13(a)(8), as quoted in the opinion supra. I do not see

how the definitions could have more broadly included the present charges unless they had contained an explicit statement that brokers' commissions were so included—a course naturally to be avoided in drafting where possible lest the stress of the one instance might suggest the exclusion of others.

I conclude, therefore, that the broker's commissions here were properly the obligation of the landlord, just as Judge Ford held in Woods v. Claving Realty Corp., supra. Illustrative decisions are of course United States v. De Porceri, 2 Cir., 161 F. 2d 526, Shaker Parkway Co. v. Porter, Em. App., 157 F.2d 920, and particularly the case relied on by Judge Ford, Bowles v. Ruppel, 3 Cir., 157 F.2d 944. In the latter case the Court refused to be drawn into the distinctions attempted in the opinion here between the greater and the less service by the broker as defining the character of his commissions. True, there the broker was doing somewhat more for the landlord; but if the landlord is receiving some benefit, as it surely was by the screening process here, I cannot believe it sound to make a distinction between the case where the broker collects only the first month's rent and that where he continues to collect later installments. Distinctions of serious consequence thus based upon small differences of fact are always unfortunate in a general regulatory scheme; they put an unfortunate premium on sophistication, the knowhow in dealing with the regulations, and an unfortunate burden upon those most in need who must employ every possible means in the competitive struggle to reach the landlord even to hiring the broker who appears to control the direct approach to the prize. Why, for example, should Miss Conti be favored over Mrs. Hutchinson, who actually discovered the vacant apartment herself, and then took that knowledge to the broker? Legally such small discriminations have no place in a regulatory plan which has for its basic yardstick the renting situation in New York as of March 1, 1943, when the landlords paid

---

[1] This change in practice answers the contention that a decision for the tenants here is so harsh on the brokers as perhaps to force them out of business; even assuming such extreme consequence, it is the landlords who are responsible through their attempt to change settled real estate practices in the city.

these charges.[2] This, too, is the answer to the "extreme" cases suggested of the charge by the tenant's lawyer for advice as to, or preparation of, the lease, or payments made for advertisements by apartment seekers for rent. Obviously those are not the kinds of charges which the landlords originally paid in 1943, but now are passing to the tenants; hence they, unlike the charges before us, are not covered by the basic yardstick. I would reverse for the like treatment of all the tenants.

---

[2] That these apartments may not have been rented until later of course does not change the result, which depends upon the meaning of the regulations; nor can a breach be overcome because of an erroneous construction of them for a period by a local rent attorney, whatever effect this might have upon the extent of the recovery.